UNITED STATES of America,
Plaintiff–Appellee,

v.

William D. KILLION, Defendant–
Appellant.

No. 92–3130.

United States Court of Appeals,
Tenth Circuit.

Oct. 13, 1993.

Jenine M. Jensen, Asst. Federal Public Defender, (Michael G. Katz, Federal Public Defender, with her on the briefs), Denver, CO, for defendant-appellant.

D. Blair Watson, Asst. U.S. Atty., (Lee Thompson, U.S. Atty., and Kim M. Fowler, Asst. U.S. Atty., with him on the briefs), Wichita, KS, for plaintiff-appellee.

Before LOGAN and KELLY, Circuit Judges, and ALLEY, District Judge.*

ALLEY, District Judge.

Defendant-appellant William D. Killion pled guilty to one count of manufacturing 83.8 grams of Phenyl–2–Propanone (P–2–P) in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. He was sentenced on April 5, 1991, to forty-six months imprisonment in accordance with the Sentencing Reform Act of 1984. He did not file a direct appeal. On July 11, 1991, Killion mailed a letter to the district court, claiming that the court erred in calculating his sentence and that he was wrongfully denied federal jail credit for time spent in state custody under a federal detainer. In view of Killion's *pro se* status, the district court construed Killion's letter as a motion for relief from an illegal sentence pursuant to 28 U.S.C. § 2255.[1] After considering the merits of the motion and the relevant precedents of our circuit, the district court, in a published decision, denied relief. *United States v. Killion*, 788 F.Supp. 1165 (D.Kan.1992). This appeal followed. We affirm.

I.

FACTS

Killion was charged with knowingly and intentionally manufacturing 83.8 grams of P–2–P with the intent of manufacturing amphetamines, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.[2] While searching the premises occupied by Killion and his co-conspirators, the government found 66.3 grams of a yellow liquid in a glassware container, and in a separate container, 17.5 grams of a hardened dark brown substance. Drug Enforcement Agency laboratory reports revealed that the 66.3 grams of yellow liquid contained 52.9 grams of P–2–P, and the 17.5 grams of dark brown substance contained an unquantifiable trace of P–2–P.

Killion was sentenced in accordance with 21 U.S.C. § 841(b)(1)(C) and § 2D1.1 of the United States Sentencing Commission Guidelines Manual (1991) ("the Guidelines"). In calculating Killion's base offense level pursuant to § 2D1.1, the district court included the entire weight of the yellow liquid and the dark brown substance, 83.8 grams. Killion was assigned a total offense level of fourteen, which carries an imprisonment range of thir-

---

* The Honorable Wayne E. Alley, United States District Judge for the Western District of Oklahoma, *sitting by designation.*

1. Section 2255 authorizes a prisoner in custody to move the sentencing court to vacate or correct the sentence that was allegedly "imposed in violation of the Constitution or laws of the United States, or ... in excess of the maximum authorized by law...." 28 U.S.C. § 2255.

2. Section 841(a)(1) provides:

    (a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
    (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; ....
    21 U.S.C. § 841(a)(1).

ty-seven to forty-six months. He received a sentence of forty-six months imprisonment.

On July 11, 1991, Killion wrote a letter to the district court challenging the length of his sentence and contending that the court erroneously included the weight of unusable waste by-products in determining his base offense level.[3] Specifically, Killion argued that the yellow liquid and the hardened dark brown substance contained waste by-products of the P–2–P manufacturing process that should not have been included in the court's calculations. From the 83.8 grams of the total mixture, Killion claimed, only 52.928 to 53.0 grams constituted P–2–P. Killion thus asserted that he should have been assigned a category twelve under the Guidelines, based on 53.0 grams of P–2–P.

The district court, construing Killion's letter as a § 2255 motion for relief from an illegal sentence, rejected Killion's request for a reduced sentence. The court found that because the yellow liquid and dark brown substance contained a "detectable amount" of P–2–P, the entire amount of the mixture should be used for sentencing, in accordance with Tenth Circuit precedent. *Id.* at 1167.

## II.

### ISSUES PRESENTED

Killion's *pro se* briefs on appeal collectively state five issues: (1) whether the district court erred in calculating Killion's base offense level based on the entire weight of the mixture; (2) whether the Guidelines unconstitutionally classify P–2–P as a Schedule II stimulant; (3) whether the district court erred in the application of the Guidelines due to the Guidelines' classification of P–2–P as a Schedule II stimulant; (4) whether the district court erred in applying the "mixture or substance containing a detectable amount" language for sentencing purposes; and (5) whether the district court erred in not applying the rule of lenity. The United States maintains that Killion is precluded from raising his second through fifth issues, as he did

not specifically assert them at the district court level, and, in any event, the issues are nonmeritorious. Killion, however, contends that he raised these issues in his letter to the district court, but that the court nonetheless ignored them.

We appointed a federal public defender to file a supplemental brief and to present oral argument with respect to Killion's first issue only, as we are persuaded that this appeal, in fact, presents only a single issue. However, in view of Killion's *pro se* status prior to our appointment of the federal public defender, coupled with our review of the letter to the district court, we elect to address the merits of all five issues raised by Killion on this appeal.

## III.

### ISSUE 1

■ The first and principal issue presented by this appeal is whether the United States Supreme Court decision, *Chapman v. United States,* —— U.S. ——, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991), supersedes the Tenth Circuit's earlier position that the weight of waste products that are the by-product of a drug manufacturing process but that contain a detectable amount of a controlled substance may be used in calculating a defendant's base offense level under § 2D1.1 of the Guidelines. The district court, citing *United States v. Dorrough,* 927 F.2d 498, 502 (10th Cir.1991), and *United States v. Callihan,* 915 F.2d 1462, 1463 (10th Cir.1990), ruled that the weight of unusable waste by-products containing a detectable amount of P–2–P are to be included for sentencing purposes under the Guidelines. *Killion,* 788 F.Supp. at 1167. Killion, however, maintains that the district court erred in including the weight of waste by-products in calculating his sentence because *Dorrough* and *Callihan* were decided prior to and were effectively overruled by *Chapman.* We review a challenge to a district court's interpretation of the Guidelines *de novo. United*

---

**3.** Killion also contended that the district court wrongfully denied him credit for time spent in state confinement and sought federal credit for the period between his arrest and his eventual

return to state custody after federal prosecution. This appeal, however, does not challenge the credit for state custody claim.

*States v. Agbai,* 930 F.2d 1447, 1448 (10th Cir.1991).

### A. *Dorrough & Callihan*

■ Section 2D1.1 of the Guidelines concerns the calculation of base offense levels for drug offenses. Footnote * to § 2D1.1(c) expressly states that "the weight of a controlled substance ... refers to the *entire weight* of any mixture or substance containing a detectable amount of the controlled substance." U.S.S.G. § 2D1.1(c) n. * (1991) (emphasis supplied). The plain language of the Guidelines, thus, requires that the entire weight of any mixture containing a detectable amount of a controlled substance be used in calculating a defendant's base offense level.

In *Dorrough,* we adopted a literal interpretation of footnote * and held that the entire weight of a mixture containing P-2-P should be used in calculating a sentence under § 2D1.1, even though, in that case, the mixture mainly consisted of waste by-products.[4] *Dorrough,* 927 F.2d at 502. In *Dorrough* the police seized 94 liters of liquid containing P-2-P prior to the completion of the manufacturing process. *Id.* At sentencing, the defendant presented evidence that the maximum amount of P-2-P that could have been produced from the liquid seized was 8.85 kilograms. *Id.* The defendant argued that only the 8.85 kilograms should have been considered in calculating his sentence and that the remaining liquid from the manufacturing process constituted waste by-products. Finding support in footnote * to § 2D1-1(c), we held that the district court properly considered the weight of the entire 94 liters because the mixture contained a "detectable amount" of P-2-P. *Id.* We rejected the defendant's argument that, in a manufacturing case, only the "maximum amount of

drugs that could be produced from the manufacturing process" should be considered. *Id.*

Similarly, in *Callihan,* we included the weight of waste by-products from the P-2-P manufacturing process in determining the total weight for purposes of the defendant's sentence, even though the actual amount of P-2-P if separated would have called for a much lower sentence. *Callihan,* 915 F.2d at 1463. The defendant there entered a plea of guilty to conspiring to manufacture, possess with intent to distribute, and distribute amphetamine, in violation of 21 U.S.C. § 846. *Id.* At the time of his arrest, 94 kilograms of a chemical mixture containing phenalytic acid, sodium acetate, acetic anhydride, and P-2-P were seized. *Id.* When heated, the chemical mixture would have produced more P-2-P. *Id.* However, at the time of the seizure, only 2.95 kilograms of P-2-P was actually present in the mixture. *Id.* We literally construed footnote * to § 2D1.1, and held that the district court did not err in basing the defendant's sentence on the weight of the entire 94 kilograms of P-2-P actually present.[5] *Id.* We explained that "[t]he footnote meant what it said: that the scale weight of a mixture or compound containing a controlled substance is the entire amount of the mixture or compound." *Id.* We also rejected the defendant's suggestion that the way that the footnote had been rewritten (to the version at issue in this case) showed that the footnote formerly had a different meaning. *Id.* We ruled that the revised footnote merely stated more efficiently the content of its predecessor. *Id.*

■ We are bound by the precedent of prior panels absent *en banc* reconsideration or a superseding contrary decision by the Supreme Court. *United States v. Spedalieri,* 910 F.2d 707, 710 n. 3 (10th Cir.1990) (a three-judge panel cannot overrule circuit

---

**4.** *Dorrough* was an appeal by a defendant convicted under 21 U.S.C. §§ 841, 846 and 18 U.S.C. § 2, of attempting to manufacture P-2-P and amphetamine; possession of P-2-P with intent to manufacture amphetamine; conspiracy to manufacture, possess, and distribute amphetamine; and traveling in interstate commerce in the aid and promotion of drug offenses.

**5.** Footnote * to § 2D1.1 at the time stated:

The scale amounts for all controlled substances refer to the total weight of the controlled substance. Consistent with the provisions of the Anti-Drug Abuse Act, *if any mixture or compound contains any detectable amount of a controlled substance, the entire amount of the mixture or compound shall be considered in measuring the quantity.*

U.S.S.G. § 2D1.1 n. * (1987) (emphasis supplied).

precedent); *United States v. Berryhill,* 880 F.2d 275, 277 (10th Cir.1989), *cert. denied,* 493 U.S. 1049, 110 S.Ct. 853, 107 L.Ed.2d 846 (1990). Killion urges reconsideration of our precedent on the grounds that the Supreme Court in *Chapman* adopted a "market oriented" approach to punishing drug trafficking that mandates that the total quantity of only what is *marketable,* rather than the *entire weight* of the mixture, be used to determine the length of a sentence under § 2D1.1 of the Guidelines. He thus contends that, in view of *Chapman,* it was error for the district court to include the weight of waste by-products that were unusable and destined for disposal in calculating his base offense level. We disagree.[6]

### B. *Chapman*

Application note 1 to § 2D1.1 of the Guidelines states that the term "[m]ixture or substance" as used in this guideline has the same meaning as in 21 U.S.C. § 841." U.S.S.G. § 2D1.1. This leads us inexorably to *Chapman,* where the Supreme Court analyzed the meaning of the term "mixture or substance" in 21 U.S.C. § 841.

In *Chapman,* the petitioners were convicted of selling ten sheets of blotter paper impregnated with lysergic acid diethylamide (LSD) in violation of 21 U.S.C. § 841(a). *Chapman,* —— U.S. at ——, 111 S.Ct. at 1922. The district court included the combined weight of the blotter paper and the LSD in determining the weight of the drug used in calculating their sentences. *Id.* Although the weight of the LSD alone was 50 milligrams, the combined weight of the LSD and blotter paper was 5.7 grams. *Id.* The 5.7 grams resulted in the imposition of a mandatory minimum sentence of five years as required by 21 U.S.C. § 841(b)(1)(B)(v). *Id.* The entire weight was also used by the district court to determine the petitioners' base offense levels under the Guidelines. *Id.* at —— – ——, 111 S.Ct. at 1922–23. The Seventh Circuit, sitting *en banc,* affirmed the sentences imposed on the petitioners by the district court. *United States v. Marshall,* 908 F.2d 1312 (7th Cir.1990) (en banc).

On certiorari, the petitioners contended either that the statute should be interpreted to not include the weight of the carrier medium blotter paper or that the Court should hold the statute violative of due process. *Chapman,* —— U.S. at —— – ——, ——, 111 S.Ct. at 1923–24, 1927. In affirming the petitioners' sentences, the Court held that the weight of the blotter paper used to distribute the LSD, and not simply the weight of the pure LSD, should be used for sentencing as the blotter paper constituted a " 'mixture or substance containing a detectable amount' of LSD." *Id.* at ——, 111 S.Ct. at 1925. The Court noted that given the facts of the case, a plain meaning interpretation of "mixture" was rational.[7] *Id.* The Court also held that inclusion of the weight of a standard carrier medium such as blotter paper in determining a defendant's sentence does not violate due process. *Id.* at —— – ——, 111 S.Ct. at 1927–28.

The Court found the petitioners' interpretation of the statute, which would include only the net weight of the LSD, to be implausible given the history and structure of 21 U.S.C. § 841. *Id.* at ——, 111 S.Ct. at 1925. In particular, the Court noted that "Congress adopted a 'market-oriented' approach to punishing drug trafficking, under which the total quantity of what is distributed, rather than

---

**6.** We do not address and leave open for consideration the possibility that the split among the circuits with respect to this question has been addressed by the United States Sentencing Commission. *See* 58 Fed.Reg. 27, 148 (1993) (to be codified at U.S.S.G.App. C, no. 484) (proposed May 6, 1993). In the event that the Commission chooses to give previously sentenced defendants the benefit of a new Guideline, it is not our intention by this opinion to foreclose Killion from seeking appropriate relief.

**7.** The Court defined "mixture" as:

A "mixture" is defined to include "a portion of matter consisting of two or more components that do not bear a fixed proportion to one another and that however thoroughly commingled are regarded as retaining a separate existence." Webster's Third New International Dictionary 1449 (1986). A "mixture" may also consist of two substances blended together so that the particles of one are diffused among the particles of the other. 9 Oxford English Dictionary 921 (2d ed. 1989).

*Chapman,* —— U.S. at ——, 111 S.Ct. at 1926.

the amount of pure drug involved, is used to determine the length of the sentence." *Id.* It is to this language that Killion cites in support of his argument that the "market-oriented" approach espoused in *Chapman* prohibits our inclusion of the weight of waste by-products in determining his base offense level pursuant to § 2D1.1 of the Guidelines.

### C. Split Among the Circuits

Since *Chapman,* the circuits have taken contrasting positions on the question whether a court may include the weight of materials such as waste by-products in calculating the weight of a mixture or substance containing a detectable amount of a controlled substance for sentencing purposes under § 2D1.1.[8] Most courts have fallen into two schools of thought, one of which centers its inquiry on whether the mixture at issue, like the blotter paper in *Chapman,* is usable, marketable and ready for ingestion or consumption; and another that does not rely on a usable/unusable distinction. The Supreme Court has acknowledged the split of authority among the circuits, *Sewell v. United States,* —— U.S. ——, —— – ——, 113 S.Ct. 1367, 1367–68, 122 L.Ed.2d 745 (1993) (White, J., Blackmun, J., dissenting) ("This marks the sixth time this issue has come before the Court in two terms."); *Walker v. United States,* —— U.S. ——, 113 S.Ct. 443, 121 L.Ed.2d 362 (1992)

(White, J., Blackmun, J., dissenting) ("[I]n the last Term alone, we have declined to review this question on three separate occasions."); *Fowner v. United States,* —— U.S. ——, ——, 112 S.Ct. 1998, 2000, 118 L.Ed.2d 594 (1992) (White, J., dissenting) ("This issue is a recurring one."), but has consistently declined to resolve it.

The Second, Third, Sixth, Seventh, Ninth, and Eleventh Circuits have adopted the approach that sentencing calculations under § 2D1.1 may not be based on the weight of mixtures containing unusable, unmarketable materials.[9] In holding that sentencing calculations should be based only on the weight of *usable* drug mixtures, these courts have distinguished the facts of *Chapman,* reasoning that the blotter paper in *Chapman* was usable, consumable and ready for wholesale or retail distribution, thus, it was rational to include its weight for sentencing purposes. *See, e.g., Acosta,* 963 F.2d at 553–556; *Rolande–Gabriel,* 938 F.2d at 1235–38. These courts reason that it is logical to include the weight of materials that are marketable or facilitate the marketability of the drug in question, and to exclude the weight of materials that do not. Furthermore, the courts reason that this interpretation is appropriate because in enacting 21 U.S.C. § 841, "Congress was concerned with mixtures that will eventually reach the streets—consumable mixtures." *Rodriguez,* 975 F.2d at 1006.

8. *See generally,* Richard Belfiore, Annotation, *Under What Circumstances Should Total Weight of Mixture or Substance in Which Detectable Amount of Controlled Substance is Incorporated Be Used in Assessing Sentence Under United States Sentencing Guideline § 2D1.1—Post-Chapman Cases,* 113 A.L.R.Fed. 91 (1993).

9. *See United States v. Acosta,* 963 F.2d 551 (2d Cir.1992) (weight of creme liqueur in which pure cocaine was dissolved should not have been included in calculating base offense levels because it was uningestible and unmarketable); *United States v. Rodriguez,* 975 F.2d 999 (3d Cir.1992) (base offense levels should have been based only on the amount of consumable cocaine that was placed on compressed blocks of boric acid because the cocaine remained separate and distinct even though it was placed in close proximity to the boric acid; and because the boric acid was not used as a cutting agent, routine transport medium, and did not facilitate the distribution of the cocaine); *United States v. Jennings,* 945 F.2d

129 (6th Cir.1991) (it would be illogical to sentence defendants on the basis of the entire weight of an undistributable methamphetamine cooking mixture containing a small amount of methamphetamine mixed with poisonous unreacted chemicals and by-products); *United States v. Johnson,* 999 F.2d 1192 (7th Cir.1993) (no rational basis to sentence based on the weight of waste water from cocaine base because the mixture was not a carrier medium and was not usable, ingestible or marketable); *United States v. Robins,* 967 F.2d 1387 (9th Cir.1992) (weight of cornmeal bricks in which cocaine was concealed should not have been included because cornmeal was not used as a carrier medium, was not a cutting agent, did not facilitate distribution of the drug, and had to be separated from the cocaine before the cocaine could be used); *United States v. Rolande–Gabriel,* 938 F.2d 1231 (11th Cir.1991) (irrational to include weight of liquid substance containing cocaine base because it did not facilitate the use, marketing or access of the drug).

The First [10] and Fifth Circuits, like the Tenth Circuit, however, have taken a contrary approach, expressly declining to overrule precedent establishing that the weight of unusable, unmarketable materials may be included for sentencing purposes under § 2D1.1. *See Walker,* —— U.S. at ——, 113 S.Ct. at 443 (White, J., Blackmun, J., dissenting) ("this case confirms the Fifth Circuit's alignment with the First and Tenth Circuits' position."). The post-*Chapman* analysis of the Fifth Circuit, in particular, is instructive.

In *United States v. Walker,* 960 F.2d 409, 412 (5th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 443, 121 L.Ed.2d 362 (1992), the Fifth Circuit noted that "*Chapman* did not involve methamphetamine; nor did it involve a liquid." *Id.* The court concluded that since *Chapman* did not speak to the issue of whether the weight of liquid waste containing methamphetamine should serve as a basis for computing a defendant's offense level, *Chapman* did not overrule Fifth Circuit precedent on that issue. *Id.*

The Fifth Circuit, in *United States v. Sherrod,* 964 F.2d 1501, 1510 (5th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993), reaffirmed this principle, holding that the *Chapman* Court did not intend for its "market-oriented" analysis to be applied to mixtures of methamphetamine. *Id.* The court noted that both the statute and the Guidelines distinguish between "pure" methamphetamine and "mixtures" containing methamphetamine, and that the *Chapman* Court itself noted the disparate treatment of methamphetamine *vis-a-vis* other types of drugs. *Id.* The circuit upheld its precedent that so long as a mixture contains a detectable amount of methamphetamine, the entire weight of the mixture should be included in calculating the base offense level. *Id.*

Further, in *United States v. Ruff,* 984 F.2d 635, 640–41 (5th Cir.1993), the Fifth Circuit held that the district court correctly considered the entire weight of mixtures containing traces of P–2–P and methamphetamine, even though testimony established that the solutions were probably residue from a manufacturing process, and that the amounts found were insufficient for use in manufacturing methamphetamine or amphetamine.[11] The court reasoned that precedent and the language of the Guidelines mandated considering the entire amount of the mixture, because P–2–P was "detectable." *Id.* at 640. *See also United States v. Eastland,* 989 F.2d 760, 767–68 (5th Cir.1993) (following Fifth Circuit precedent).

### D. The Tenth Circuit's Position

Killion urges the Tenth Circuit to adopt the interpretation of *Chapman* of the majority of jurisdictions that have construed the Court's "market-oriented" analysis.[12] Killion maintains that *Chapman* establishes that a drug distributor should be punished only for the usable, marketable total weight of a drug, including the cutting agent, dilutant, or carrier medium. He argues that this punishment is appropriate because these added products increase the distributor's financial gain by

---

**10.** *See United States v. Mahecha–Onofre,* 936 F.2d 623 (1st Cir.1991) (entire weight of suitcases composed of cocaine bonded chemically with acrylic suitcase material minus all metal parts was includable for sentencing purposes, reasoning that "ingestion" would not seem to play a critical role in the definition of "mixture or substance"), *cert. denied,* —— U.S. ——, 112 S.Ct. 648, 116 L.Ed.2d 665 (1991); *see also United States v. Lopez–Gil,* 965 F.2d 1124 (1st Cir.1992) (following First Circuit precedent and holding that it was proper to include the weight suitcase made of fiberglass-cocaine mixture), *panel reh'g denied* (suitcase issue), *panel reh'g denied* (part of original opinion withdrawn and case remanded to district court for further findings on other grounds), *cert. denied,* —— U.S. ——, 113 S.Ct. 484, 121 L.Ed.2d 388 (1992); *United States v. Restrepo–Contreras,* 942 F.2d 96 (1st Cir.1991) (proper to include the entire weight of statue made of cocaine and beeswax because the court could discern no meaningful difference between an acrylic-cocaine suitcase and a beeswax-cocaine statue), *cert. denied,* —— U.S. ——, 112 S.Ct. 955, 117 L.Ed.2d 123 (1992).

**11.** *Ruff,* as the dark brown substance in this case, involved mere "trace" amounts of P–2–P. The court noted that under the plain meaning of the Guidelines, which speak of "detectable," rather than "measurable" amounts of methamphetamine, the words "detectable amount" would include any quantity, however small, that can be discerned by accepted methods of analysis. *Ruff,* 984 F.2d at 640.

**12.** *See supra* note 9.

either increasing the amount sold, or converting the drug into marketable form. In addition, Killion alleges that waste by-products, that are merely disposed of, are not part of the "mixture or substance" for sentencing purposes because such materials constitute a "useless mixture."

■ In view of our clear precedent, as well as our interpretation of the decisions of the Fifth Circuit, we today again hold that so long as a mixture or substance contains a detectable amount of a controlled substance, its entire weight, including waste by-products of the drug manufacturing process, may be properly included in the calculation of a defendant's base offense level under § 2D1.1 of the Guidelines. Although we acknowledge the split of authority among the circuits with respect to this issue, we have consistently construed § 2D1.1 in this manner, and do not view *Chapman* as overruling *Dorrough* and *Callihan*.[13]

In our view, the *Chapman* Court's discussion of the "market-oriented" approach was intended to be interpreted in the context of the question presented before the Court. The Court confronted the narrow question of whether the weight of a LSD carrier medium, blotter paper, may be included when determining sentences for trafficking in LSD. *Chapman*, —— U.S. at ——, 111 S.Ct. at 1922. The Court was specific in its reference to LSD prior to analyzing Congress' intent, and, indeed, elaborated upon the uniqueness of LSD *vis-a-vis* other drugs. *Id.* at —— —— ——, 111 S.Ct. at 1924–26. The Court did not speak to the issue of whether the weight of waste by-products from the drug manufacturing process may serve as a basis for computing a defendant's base offense level pursuant to § 2D1.1 of the Guidelines, and more specifically, did not address the controlled substance at issue in this case—P–2–P. Thus, *Chapman* did not overrule *Dorrough* and *Callihan. See Walker,* 960 F.2d at 412.

Furthermore, we note that the Court in *Chapman* expressly rejected the petitioners'

argument that "the weight of the carrier should be excluded, the weight of the pure LSD should be determined, and that weight should be used to set the appropriate sentence." *Chapman*, —— U.S. at ——, 111 S.Ct. at 1924. In so ruling the Court stated:

We think that petitioner's reading of the statute—a reading that makes the penalty turn on the net weight of the drug rather than the gross weight of the carrier and drug together—is not a plausible one. The statute refers to a "mixture or substance containing a detectable amount." *So long as it contains a detectable amount, the entire mixture or substance is to be weighed when calculating the sentence.*

*Id.* (emphasis supplied). Killion's interpretation of *Chapman* would require us to impose a sentence based on the net weight of the pure P–2–P found in the containers, rather than the gross weight of the mixtures, which contained a "detectable amount" of P–2–P. This is contrary to the Court's explicit statement above. Our view of *Chapman*, in which the entire weight of a mixture is used so long as it contains a detectable amount of a controlled substance, is consistent with the Court's analysis as well as footnote * to § 2D1.1(c). *See id.;* U.S.S.G. § 2D1.1(c) n.* (1991).

Finally, we note that Killion, in urging us to adopt an approach that relies upon a "usable/unusable" or "marketable/unmarketable" distinction, focuses primarily on the *Chapman* language: "Congress adopted a 'market-oriented' approach to punishing drug trafficking, under which the total quantity of what is distributed, rather than the amount of pure drug involved, is used to determine the length of the sentence." *Chapman*, —— U.S. at ——, 111 S.Ct. at 1925. He appears to ignore the statement following this language, *to wit:* "[Congress] intended the penalties for drug trafficking to be graduated according to the weight of drugs in whatever form they were found—cut or uncut, *pure or impure,* ready for wholesale or ready for

---

**13.** As we noted previously, the Supreme Court has acknowledged the split among the circuits with respect to this question but has declined to resolve it. In *Fowner,* —— U.S. at ——, 112 S.Ct. at 1998, the Supreme Court denied a petition for a writ of certiorari on a Tenth Circuit order and judgment presenting the question presented here.

distribution at the retail level." *Id.* (emphasis supplied).

■ In sum, we rule that the weight of waste by-products from the drug manufacturing process may be used in calculating a defendant's base offense level under § 2D1.1 of the Guidelines, provided, of course, that the mixture or substance contains a detectable amount of the controlled substance in question. In this case, the evidence showed that there was 52.9 grams of P–2–P in the yellow liquid, and an unquantifiable trace of P–2–P in the hardened dark brown substance. There was thus a "detectable amount" of P–2–P present in both containers, and the district court did not err in using the entire weight of the mixtures, including the weight of any waste by-products, in calculating Killion's base offense level.

## IV.

### ISSUES 2–3

■ Killion's second issue alleges that the Guidelines improperly and unconstitutionally classify P–2–P as a Schedule II stimulant. He contends that P–2–P is not a Schedule II stimulant because there is no scientific evidence available to establish that it is a stimulant. Killion's third issue asserts that the district court erred in applying the Guidelines due to this improper and unconstitutional classification of P–2–P.

We are unpersuaded that the Guidelines incorrectly and unconstitutionally classify P–2–P. P–2–P is a known and listed "immediate precursor" chemical used in the manufacture of amphetamine and methamphetamine. *See* 21 U.S.C. § 802(6), (22). We have held that amphetamine and methamphetamine are properly classified as Schedule II controlled substances. *United States v. Lafoon*, 978 F.2d 1183, 1184–85 (10th Cir.1992); *United States v. Sullivan*, 967 F.2d 370, 373 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 285, 121 L.Ed.2d 211 (1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1013, 122 L.Ed.2d 161 (1993). Pursuant to 21 U.S.C. § 811(e), the "Attorney General may ..." place an immediate precursor in the same schedule in which the controlled substance of which it is an immediate precursor is placed

or in any other schedule with a higher numerical designation." 21 U.S.C. § 811(e). It is clear from the statute that the Attorney General chose to classify P–2–P as a Schedule II controlled substance because the controlled substances of amphetamine and methamphetamine are so classified. We find no impediment to the Guidelines' classification of P–2–P.

## V.

### ISSUE 4

■ The fourth issue asserted by Killion is whether the district court erred in applying the "mixture or substance containing a detectable amount" language for sentencing purposes. Killion alleges that P–2–P offenses fall under 21 U.S.C. § 841(b)(1)(C), and that the above language applies only to those substances listed under 21 U.S.C. § 841(b)(1)(A)–(B).

We are unpersuaded by Killion's analysis. Section 841(b)(1)(C) sets forth penalties for violations involving controlled substance "in schedule I or II except as provided in subparagraphs (A), (B), and (D)...." Nothing in § 841(b)(1)(C) negates the application of the "mixture or substance containing a detectable amount" language. Although the Guideline echoes the statute to some extent, it is not congruent. It is the Guideline we are construing and applying.

## VI.

### ISSUE 5

■ The fifth issue raised by Killion is whether the district court erred in not applying the rule of lenity. Killion contends that because of the lack of any statutory application of the phrase, "mixture or substance containing a detectable amount," the rule of lenity is applicable, and 21 U.S.C. § 841(b) and § 2D1.1 of the Guidelines must be construed in his favor.

We hold that there is no reasons to resort to the rule of lenity in this case. As noted in *Chapman,* the rule of lenity is not applicable unless there is a

"grievous ambiguity or uncertainty in the language and structure of the Act," such

that even after a court has " 'seize[d] every thing from which aid can be derived' " it is still "left with an ambiguous statute." "The rule [of lenity] comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers."

*Chapman*, —— U.S. at ——, 111 S.Ct. at 1926 (citations omitted).

A straightforward reading of the statute and the Guideline at issue here, requiring that the weight of the entire mixture be included in determining a defendant's base offense level so long as the mixture contains a detectable amount of the controlled substance in question, does not produce results so absurd or glaringly unjust as to raise reasonable doubt in regard to Congressional intent. *See id.* at —— – ——, 111 S.Ct. at 1926–27.

## VII.

### CONCLUSION

For the foregoing reasons, the ruling of the district court is **AFFIRMED.**