**UNITED STATES of America, Appellee,**

v.

**Roderick A. CAMPBELL,
Defendant, Appellant.**

No. 94–1546.

United States Court of Appeals,
First Circuit.

Heard May 3, 1995.

Decided July 31, 1995.

Rehearing and Suggestions for Rehearing En Banc Denied Oct. 10, 1995.

978

Albert B. West, by appointment of the Court, Providence, RI, for appellant.

Roderick A. Campbell on brief, pro se.

Margaret E. Curran, Asst. U.S. Atty., with whom Sheldon Whitehouse, U.S. Atty., and Kenneth P. Madden, Asst. U.S. Atty., Providence, RI, were on brief, for appellee.

BOUDIN, Circuit Judge, COFFIN, Senior Circuit Judge, and STAHL, Circuit Judge.

COFFIN, Senior Circuit Judge.

Appellant Roderick Campbell was convicted on six counts related to the manufacture and distribution of phenylacetone (P2P) and sentenced to a term of imprisonment of 288 months. He raises numerous issues concerning his trial and sentencing, none of which we find meritorious.

## I. *Factual and Procedural Background*

We begin with a brief review of the facts, as the jury could have found them, providing more details later in the opinion as necessary to provide context for our discussion.

In early 1993, a special agent for the Drug Enforcement Agency working in an undercover role initiated a relationship with defendant Campbell. The agent, Kelly, claimed to be working for a New York organization that was looking for a steady source of P2P to be used in the manufacture of methamphetamine. Campbell agreed to set up a laboratory.

On February 10, 1993, Kelly met Campbell at a laboratory that had been set up in a home in Cranston, Rhode Island. Campbell delivered a small amount of a substance that was supposed to be P2P, but testing showed that it was not. Campbell indicated to Kelly that the negative results were due to his use

of an alternative manufacturing method designed to avoid the distinctive odor associated with the traditional method of manufacturing P2P. A second sample delivered about two weeks later, manufactured by the traditional method, did contain P2P.

In March, Campbell moved the lab to a new location in Providence, and Kelly was introduced to Campbell's associate, Harold Farrell, who said that he would be responsible for delivering the P2P from that point on. Farrell indicated to Kelly that 100 gallons of P2P would be manufactured. During March and April, six separate deliveries of mixtures containing P2P were made to Kelly by either Farrell alone or by both Farrell and Campbell. An additional seven deliveries were determined not to contain any P2P.

Campbell, Farrell and two laboratory assistants were arrested on May 26, 1993. A DEA chemist testified that when he entered the laboratory that day he observed active chemical reactions consistent with the manufacture of P2P, and also found in the lab all of the chemicals necessary to produce P2P.

A federal grand jury originally charged Campbell and Farrell in an eighteen-count indictment. Seven distribution counts were dismissed after laboratory analysis showed that the mixtures involved in those deliveries tested negative for the presence of controlled substances. Farrell pleaded guilty to ten counts, and was sentenced to ten concurrent terms of 48 months' imprisonment.

A redacted indictment was filed at the outset of Campbell's trial, charging him with seven counts: conspiracy to manufacture, distribute and possess with intent to distribute P2P, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (count one); knowingly and intentionally manufacturing P2P, in violation of § 841(a)(1), (b)(1)(C), and 18 U.S.C. § 2 (count two); maintaining a place for the purpose of manufacturing P2P, in violation of § 856 (count three); knowingly and intentionally distributing P2P on three dates in February, March and April 1993, in violation of § 841(a)(1), (b)(1)(C), and 18 U.S.C. § 2 (counts four through six); and conspiracy to

manufacture methaqualone, in violation of § 846 (count seven).

Campbell's defense was that he never intended to manufacture P2P, but instead sought to mislead his customer, Kelly, into purchasing lawful chemical substances. He testified that he hoped to finance legitimate business interests with money made from the sale of these substances. He claimed that the presence of P2P in some of the deliveries was inadvertent.

Following eight days of trial, the jury found Campbell guilty on counts one through six, the P2P counts, and not guilty on count seven, the methaqualone count. He was sentenced to concurrent 288–month terms of imprisonment on all but count three, and to a concurrent 240–month term (the statutory maximum) on that count. This appeal followed.

## II. *Challenges to Conviction*

We address Campbell's several claims in turn.

### (1) *"Detectable" Quantity of P2P*

■ Campbell makes several arguments that all reduce essentially to the claim that his conviction was unlawful because the amount of P2P confiscated was too small. As a starting point, we note that the statutes contain no language setting a minimum quantity as a prerequisite for prosecution. *See* 21 U.S.C. § 841(a)(1) ("[I]t shall be unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance. . . ."). *See also id.* at §§ 846, 856.[1] Ample caselaw further establishes that no specific quantity needs to be proven for conviction. *See United States v. Restrepo–Contreras*, 942 F.2d 96, 99 n. 1 (1st Cir.1991); *see also United States v. Bounds*, 985 F.2d 188, 193–94 (5th Cir. 1993); *United States v. Kwong–Wah*, 966 F.2d 682, 685 (D.C.Cir.1992) (citing other cases).

■ The amount of the controlled substance underlying a criminal indictment typically becomes relevant only at the penalty

---

1. Campbell does not contest that P2P is a controlled substance.

stage. *See* 21 U.S.C. § 841(b); *Kwong–Wah*, 966 F.2d at 685. The Sentencing Guidelines set penalties based on weight, and state that the weights set forth in the Drug Quantity Table refer to "the entire weight of any mixture or substance containing a detectable amount of the controlled substance." U.S.S.G. § 2D1.1 n.\*. Thus, any "detectable amount" is sufficient to trigger a penalty.

■ Taking this scheme at face value, Campbell's conviction is rock solid since no one disputes that a "detectable" amount of P2P was obtained. Campbell, however, claims that the Constitution requires a different analysis when the controlled substance at issue is a precursor chemical like P2P, whose manufacture and possession is proscribed solely because of its relationship to another controlled substance (in the case of P2P, either amphetamine or methamphetamine). *See* 21 U.S.C. § 811(e) (authorizing Attorney General to place an immediate precursor in the same schedule in which the controlled substance of which it is an immediate precursor is placed or in any higher schedule). Campbell maintains that a precursor must be found in sufficient quantity to be useable in making the controlled substance to which it owes its illegality. Prosecuting lesser amounts, he asserts, is outside the scope of Congress' intent in regulating controlled substances and an impermissibly vague application of federal drug laws.

Whatever the merits of such arguments in a case in which a totally unuseable amount of a controlled precursor chemical has been seized, *see United States v. Ruff*, 984 F.2d 635, 639 (5th Cir.1993),[2] they are unavailing here. The defendant's own expert testified that the samples delivered in this case contained enough P2P to produce at least a small amount of methamphetamine.[3] Thus, the charged conduct fell directly within the statutory goal of controlling chemicals that may be used in the manufacture of a controlled substance. *See* 21 U.S.C. § 802(23) (defining "immediate precursor"). We see no basis upon which to exclude small amounts of useable precursors from the statutory prohibition.

■ Consequently, we need not explore the boundaries of the Congressional grant of authority to criminalize the manufacture of precursor chemicals. The fact that Campbell did produce a useable amount of P2P also is fatal to his vagueness argument, which rests upon the assertion that he could not have known that unuseable amounts of P2P would subject him to prosecution.[4]

### (2) *Reasonable Doubt Instruction*

■ As part of its reasonable doubt instruction, the district court told the jury that "a reasonable doubt is sometimes described as a fair doubt based upon reason and common sense." Campbell contends that this phrase made the court's reasonable doubt

2. The Court in *Ruff* reversed a defendant's conviction for possession of P2P with intent to manufacture methamphetamine because the only P2P possessed by the defendant—trace amounts that appeared to be the residue from a manufacturing process—was not enough for manufacturing purposes. 984 F.2d at 639.

3. Dr. Suggs stated that the substances seized could be used to produce from "one or two" methamphetamine pills to "many dozens of pills," depending upon the percentage of P2P in the mixtures and the method of production. He testified that, according to his appraisal of the government's data, there was between eight percent and less than one percent P2P contained in the samples.

4. Indeed, the vagueness argument is entirely inapplicable here. "[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is

prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983) (quoted in *Posters 'N' Things, Ltd. v. United States*, —— U.S. ——, ——, 114 S.Ct. 1747, 1754, 128 L.Ed.2d 539 (1994)). The statute's absolute prohibition against the manufacture, use and possession of controlled substances provides an explicit warning against dealing with *any* quantity.

Nor does the Guidelines' reference to "detectable" quantities render the scheme unduly vague. The message is clear that those who dabble in controlled substances will be subject to prosecution if such substances are found. The fact that increasingly sophisticated technology permits increasingly smaller amounts to be detectable presents no constitutional vagueness problem; it simply means that the opportunities for violating the law without being caught are decreasing.

instruction constitutionally defective, citing *United States v. Campbell,* 874 F.2d 838 (1st Cir.1989). We disagree. In *Campbell,* we rejected a defendant's attack upon reasonable doubt instructions given at his trial, but also said that courts should avoid equating reasonable doubt with fair doubt. *Id.* at 842–43. Here, the court spoke of a fair doubt "based upon reason and common sense." Since a reasonable doubt may be properly described as a doubt based on reason, *Victor v. Nebraska,* —— U.S. ——, ——, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994), the concept of reasonable doubt was present in the very formulation under attack. We do not believe the jury would have understood use of the additional adjective "fair" to have altered the correct meaning.

Moreover, the court used the term "fair doubt" but once; it used the term "reasonable doubt" no fewer than fifteen times. For example, the court instructed the jury that the defendant "is presumed innocent unless and until the Government proves him guilty beyond a reasonable doubt" and that "in order to convict the Defendant of any of these charges, the Government has to prove all of the elements applicable to that charge beyond a reasonable doubt." Taking the instructions as a whole, we are convinced that the jury was properly advised of the very high degree of confidence in Campbell's guilt needed in order to convict.[5] We see no reasonable likelihood that use of the term here led the jury to apply a constitutionally deficient standard. *See id.* at ——, 114 S.Ct. at 1243.

### (3) *Cross–Examination of Expert Witness*

■ Campbell next contends that the court erred in allowing only his attorney, rather than him personally, to cross-examine a government expert witness. A defendant has a right to be represented by counsel, *Gideon v. Wainwright,* 372 U.S. 335, 344–45, 83 S.Ct. 792, 796–97, 9 L.Ed.2d 799 (1963), or

to proceed *pro se, Faretta v. California,* 422 U.S. 806, 819–20, 95 S.Ct. 2525, 2533, 45 L.Ed.2d 562 (1975), but does not have the right to "hybrid representation"—choosing those portions of the trial he wishes to conduct and leaving the rest to counsel. *McKaskle v. Wiggins,* 465 U.S. 168, 183, 104 S.Ct. 944, 953, 79 L.Ed.2d 122 (1984). This does not mean that hybrid representation is forbidden; rather, "it is to be employed sparingly and, as a rule, is available only in the district court's discretion." *United States v. Nivica,* 887 F.2d 1110, 1121 (1st Cir.1989). Stressing the highly technical nature of the expert's testimony, Campbell argues that he, far more than his lawyer, possessed the scientific expertise necessary for effective cross-examination.

■ We see no abuse of discretion in the trial judge's decision to the contrary. The court found that, while defendant was an expert in chemistry, defense counsel more effectively could elicit the technical testimony in a fashion that would be intelligible to the jury. Moreover, the court took pains to accommodate Campbell's request. Defense counsel cross-examined the expert thoroughly, frequently conferring with Campbell as he went. At the close of redirect testimony, the court specifically asked the defense if it needed further time to confer, ostensibly to determine whether to conduct recross-examination, and both defense counsel and Campbell personally informed the court that they were "all set." In sum, the district court balanced Campbell's interest in bringing his knowledge of chemistry to bear on the cross-examination of an important government witness with its responsibility for the orderly administration of the trial. It exercised its discretion quite appropriately.

### III. *Challenges to Sentencing*

■ Campbell claims that the district court over-sentenced him in a variety of ways.[6] After reviewing each of these claims

---

5. Indeed, our determination that Campbell's rights were unimpaired by this instruction is reinforced by his counsel's treatment of this issue at trial. Counsel initially objected to use of the term "fair doubt," but the next day, when the court asked for proposed clarifying language to read to the jury, he did not offer any. While we

need not treat this as formal waiver, it confirms our view that use of the term was insignificant here.

6. The November 1993 edition of the federal sentencing guidelines applies to this case. *See United States v. Muniz,* 49 F.3d 36, 39 n. 3 (1st

with care, we have concluded, for the reasons that follow, that all are either legally or factually flawed.[7]

### (1) Calculation of Offense Level

As noted earlier, see Section II(1) *supra*, sentences for controlled substance convictions are linked to the quantity of drugs for which the defendant is found responsible. *See United States v. Muniz*, 49 F.3d 36, 39 (1st Cir.1995). Campbell argues that the district court made two crucial errors in using a total of 5,628.1 milliliters of P2P to calculate his base offense level: (1) it wrongly included the total weight of the mixtures containing P2P, rather than looking only to the actual P2P in those mixtures, and (2) it wrongly included the weight of the mixtures that tested negative for P2P. We consider each of these assertions in turn.

*Total weight.* The defendant's argument that only the actual amount of P2P should be considered is based on a 1993 amendment to the commentary that follows the applicable guideline, U.S.S.G. § 2D1.1. The guideline states that, unless otherwise specified, "the weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance." § 2D1.1(c) (Drug Quantity) n.*. The commentary provides, in relevant part, that:

> [m]ixture or substance does not include materials that must be separated from the controlled substance before the controlled substance can be used. Examples of such materials include the fiberglass in a cocaine/fiberglass bonded suitcase, beeswax in a cocaine/beeswax statue, and waste wa-

ter from an illicit laboratory used to manufacture a controlled substance.

§ 2D1.1(c), comment. (n.1). In promulgating the amendment, the Sentencing Commission sought to resolve a conflict in the circuits "regarding the meaning of the term 'mixture or substance,' as used in § 2D1.1 by expressly providing that this term does not include portions of a drug mixture that have to be separated from the controlled substance before the controlled substance can be used." U.S.S.G.App. C, amend. 484. *See United States v. Killion*, 7 F.3d 927, 932–33 (10th Cir.1993) (describing conflict and citing cases).[8]

The commentary and explanation make it clear that the district court properly considered the total weight of the P2P mixtures. The commentary excludes only materials that are unusable or unmarketable, such as those used to transport the controlled substance, see, e.g., *United States v. Mahecha–Onofre*, 936 F.2d 623, 625–26 (1st Cir. 1991); *United States v. Palacios–Molina*, 7 F.3d 49, 51–54 (5th Cir.1993), or waste products of the drug manufacturing process that are discarded before the controlled substance is put into the distribution chain, see, e.g., *United States v. Johnson*, 999 F.2d 1192, 1194 (7th Cir.1993). The mixtures in this case did not contain surplus materials that needed to be separated from the P2P before it was useable. Both the defendant's and government's experts testified that methamphetamines may be made from such mixtures, and, indeed, the mixtures themselves were the products sold by Campbell to Kelly. *See Palacios–Molina*, 7 F.3d at 54 ("[I]t is the amount of th[e] commodity trafficked that counts."). As such, the non-P2P materi-

---

Cir.1995). Unless otherwise noted, all references are to that version.

**7.** In an easily resolved claim, Campbell contests the district court's imposition of a two-level enhancement for abuse of his special skill as a chemist. This enhancement is indicated when a defendant "used a special skill ... in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. Those possessing the requisite special skills include "pilots, lawyers, doctors, accountants, chemists, and demolition experts." *Id.* at comment. (n.2) (emphasis added). Thus, there is no abuse of discretion in the court's conclusion that Campbell's near Ph.D. training as a chemist fa-

cilitated his commission of the crime of manufacturing the chemical P2P.

**8.** This circuit had held that the weight of unusable, unmarketable materials may be included for sentencing purposes. *See, e.g., United States v. Mahecha–Onofre*, 936 F.2d 623, 625–26 (1st Cir. 1991) (entire weight of suitcases composed of cocaine bonded chemically with acrylic suitcase material minus all metal parts was includable for sentencing purposes); *United States v. Restrepo–Contreras*, 942 F.2d 96, 99 (1st Cir.1991) (proper to include weight of statues made of cocaine and beeswax).

als in these mixtures were akin to cutting agents or impurities, not waste products.[9] Thus, in these circumstances, the guideline provides for counting the total weight of the liquids containing P2P.[10]

■ *Negative mixtures.* Campbell and Farrell delivered a total of 4007.1 milliliters of substances that turned out to contain no detectable amounts of P2P. The district court included this amount in calculating Campbell's offense level based on a finding that Campbell "conspired to manufacture and to possess with intent to distribute all P2P whether it turned out to be P2P or not or whether it turned out to be a mixture or substance containing only relatively small amounts of P2P."

This approach to drug quantity is proper. The span of the conspiracy charged in the indictment encompassed all fourteen deliveries, including the seven that ultimately tested negative. The guidelines state, in relevant part:

> If the offense involved both a substantive drug offense and an attempt or conspiracy (e.g., sale of five grams of heroin and an attempt to sell an additional ten grams of heroin), the total quantity involved shall be aggregated to determine the scale of the offense.

U.S.S.G. § 2D1.1, comment. (n.12). The same evidence that permitted the jury to find, beyond a reasonable doubt, that Campbell intended to produce P2P supported the court's finding that each delivery, regardless of its actual P2P content, was an intended part of the charged scheme. *See supra* at 978–79.[11] Under the guideline provision quoted above, such a finding requires inclusion of the negative substances in the drug quantity calculation. *See United States v. Youngpeter*, 986 F.2d 349, 354 (10th Cir.1993) (where effort to produce six pounds of methamphetamine produced only one because of "inept cooking ability," full amount intended is counted).[12] *Cf. Muniz*, 49 F.3d at 39 (if defendant had either the intent or capacity to deliver the full amount of drugs under negotiation in an aborted narcotics transaction, then that amount must be included); *United States v. White*, 888 F.2d 490, 499 (7th Cir. 1989) ("The Guidelines treat success and failure, conviction and no conviction, alike in drug cases, so long as the amounts are ascertainable.")

We therefore detect no error in the court's basing Campbell's sentence on the full amount of the liquids delivered during the course of the conspiracy.

9. Defendant cites *United States v. Mimms*, 43 F.3d 217 (5th Cir.1995) (*per curiam*), in support of his contention that only the actual P2P should be counted. The court in *Mimms* remanded for further fact findings after concluding that the district court had misinterpreted expert testimony concerning the amount of P2P contained in three containers holding about 32 pounds of a slurry-liquid substance. The district court erroneously thought the expert had stated that 20 percent of the entire exhibit was P2P when, in fact, the expert had indicated that 20 percent of the liquid poured from the three containers (at most, 91.55 grams) was P2P. The Fifth Circuit's discussion, somewhat sketchy in this *per curiam* opinion, suggests that the district court should have used the weight of only the 20 percent of the liquid that was P2P.

Nothing in the opinion, however, indicates whether the liquid mixture containing the P2P was useable or marketable. It was described as resulting from "a reaction mixture." *Id.* at 220. We therefore view *Mimms* as distinguishable from this case, where testimony showed the entire substance to be both useable and marketable. *See also United States v. Towe*, 26 F.3d 614, 616–17 (5th Cir.1994) (*per curiam*) (improper to sentence defendant based on total weight of mixture containing P2P if mixture contained waste products).

10. Because the offense level calculation properly took into account the total quantity of the mixtures, we reject defendant's claim that the district court erred in denying his motion for funds to analyze the concentrations of P2P in the mixtures.

11. The district court's sentencing findings, of course, may be based on the lower preponderance-of-the-evidence standard. *United States v. Legarda*, 17 F.3d 496, 499 (1st Cir.1994). We review its findings of fact at sentencing under the deferential clearly erroneous standard. *Muniz*, 49 F.3d at 41.

12. *Youngpeter* involved U.S.S.G. § 2D1.4, which provided that if the defendant is convicted of a conspiracy or an attempt to commit any controlled substance offense, the offense level shall be the same "as if the object of the conspiracy or attempt had been completed." That section later was subsumed within § 2D1.1. *See* U.S.S.G.App. C, amend. 447.

(2) *Enhancement for Obstruction of Justice*

 Campbell next contests the imposition of a two-level enhancement for obstruction of justice, which was based upon the court's finding that he had committed perjury. The guidelines specifically list perjury as a trigger of the obstruction enhancement. U.S.S.G. § 3C1.1 comment., (n.3(b)). And the court clearly applied the correct legal test for perjury: whether the defendant intentionally gave false testimony concerning a material matter. *See United States v. Dunnigan,* — U.S. —, —, 113 S.Ct. 1111, 1116, 122 L.Ed.2d 445 (1993); *United States v. Matiz,* 14 F.3d 79, 84 (1st Cir.1994). Thus, the only basis for disturbing the enhancement is if the fact finding of perjury were clearly erroneous. *United States v. Tracy,* 36 F.3d 199, 202 (1st Cir.1994).

The court based its finding on Campbell's testimony at trial and a three-day sentencing hearing, during which he consistently maintained that the P2P in the mixtures he delivered had been produced by accident; his true intent, he maintained, was not to produce any P2P, but to deceive his purchasers into believing they were receiving P2P. The court made express fact findings supporting its perjury determination at the conclusion of the sentencing hearing, noting that a number of factors belied Campbell's story. First, it found incredible Campbell's contention that he was attempting to deceive individuals whom he believed to be New York-based narcotics traffickers, because he had no means of protecting himself when they found out that they had been swindled. Second, the court found it implausible that he would have told his co-conspirator that the substances being delivered were 85% P2P, as he admitted he had, if he believed they contained no P2P at all. Third, the court found that the complexity and sophistication of the laboratory Campbell established supported the conclusion that he intended to produce P2P, not, as he claimed, to deceive one of the purchasers who obviously had no experience in chemistry or P2P production and could

have been deceived by a far less elaborate setup. The court went on to find that, at several points, Campbell gave testimony at his sentencing hearing that was facially implausible and contradictory.

In short, after reviewing the trial and sentencing transcripts, we find the court's conclusion that Campbell gave deliberately false testimony to be amply supported in the record. Since the false testimony was relevant to whether he possessed the required mental state for the crime and to the severity of sentence, it was obviously material. *See Matiz,* 14 F.3d at 84 (court of appeals can make materiality determination absent express district court finding). Thus, we affirm the obstruction enhancement.

(3) *Upward Departure in Criminal History*

 Campbell also takes issue with the upward adjustment of his Criminal History Category (CHC) based on the court's determination that his original CHC did not account for all of his prior criminal activity, and that Campbell was likely to be a recidivist. First, in a single sentence without any citation to legal authority, he contends that the court gave insufficient notice of its intent to depart, and of its reasons for departing. By failing to develop this point adequately, Campbell has forfeited it. *United States v. Fahm,* 13 F.3d 447, 450 n. 2 (1st Cir.1994).[13] His broader claim that the court erred in its departure, while properly before us, gives him no greater succor.

 In general, we use a three-part inquiry to assess a court's decision to depart: "first, are the circumstances of the case sufficiently unusual to justify departure; second, do the relied-upon factual circumstances actually exist; and third, is the departure reasonable." *United States v. Parkinson,* 44 F.3d 6, 9 (1st Cir.1994) (citations omitted). There is no question that the circumstances here are of a type that may warrant departure. *See* U.S.S.G. § 4A1.3, p.s. (expressly authorizing departure when "reliable information indicates that the [CHC] does not

---

**13.** We note that the argument had little promise in any event, for the presentence report and the government's sentencing memorandum notified Campbell of the grounds ultimately relied upon by the court for its upward departure.

adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes"); *accord Fahm,* 13 F.3d at 450.

◼ We review the court's factual findings for clear error, and we give considerable deference to its "judgment call" as to whether those facts warrant the departure. *Id.* at 450–51. Here, the court made several independent findings, any one of which was sufficient to trigger the adjustment. The court found that Campbell had engaged in assorted criminal conduct that had not been included in his CHC, including manufacturing and selling grignard reagents after learning that they were being used for illegal purposes and making deliveries of PCP (commonly known as angel dust) in addition to a delivery in 1983 for which he was convicted. The basis for both of these findings were admissions by Campbell himself, hardly the stuff of clear error. Moreover, based on the fact that Campbell committed the instant crimes shortly after being released from a significant prison term for similar conduct, and on the court's finding that he had displayed a complete lack of contrition or remorse during the proceedings, the court concluded that he was likely to return to similar criminal activity upon his release. The court's fact findings were not clearly erroneous, and we see no basis here for disturbing the court's judgment that an enhancement was indicated. Finally, in light of the multiple grounds upon which the enhancement was based, we can hardly say that the amount of the enhancement, from CHC III to CHC IV, was unreasonable.

### (4) The 416 vs. 75 Multiplier

◼ Campbell claims that the district court erred by using the wrong multiplier to convert the weight of the P2P into its equivalent marijuana weight. Deriving a marijuana weight was necessary because the Drug Quantity Table in the sentencing guidelines lists offense levels for only the most common types of controlled substances. To determine the appropriate sentence for crimes involving less common substances, such as P2P, a judge must calculate their marijuana equivalent.

Drug Equivalency Tables are provided for this purpose. According to the relevant table, one gram of P2P is equivalent to 416 grams of marijuana "when possessed for the purpose of manufacturing methamphetamine." "[I]n any other case," one gram of P2P is equivalent to 75 grams of marijuana.

The district court selected the 416 multiplier because of its fully supportable finding that Campbell knew that the P2P he was making was intended ultimately to be used to manufacture methamphetamine. Campbell, however, argues that the higher multiplier applies only when P2P possessors also are the methamphetamine manufacturers, since only then would a defendant in fact possess the P2P "for the purpose of manufacturing methamphetamine."

Although such an interpretation seems technically possible given the language of the provision, closer analysis reveals its flaw. The government suggests that the provision reflects a judgment by the Sentencing Commission to attach a higher penalty to the most serious possession of P2P—for the purpose of manufacturing methamphetamine— as distinguished from possession of P2P for use in making amphetamine or possession without knowledge of its intended use. According to the government, an individual making P2P destined for use in manufacturing methamphetamine is thus subject to the 416 multiplier, whether or not that person actually intended to manufacture the methamphetamine.

While there is no caselaw on point, the history of the P2P listings in the equivalency table supports this view of the provision's reach. Before November 1989, those listings contained different conversion amounts for P2P explicitly depending upon whether the P2P was an amphetamine precursor or a methamphetamine precursor. *See* U.S.S.G.App. C, amend. 125.[14] An amend-

---

**14.** The earlier version of the table stated that "1 gm of Phenylacetone/P2P (amphetamine precursor)" equalled 0.375 grams of cocaine or 0.075 grams of heroin and that "1 gm of Pheny-lace[t]one/P2P (methamphetamine precursor)" equalled 0.833 grams of cocaine or 0.167 grams of heroin. U.S.S.G.App. C, amend. 125. A later amendment changed the cocaine and heroin ref-

ment to the guidelines at that time changed the language to its present form, without any accompanying explanation that the revision was meant to change the basic reason for the two-tiered approach to P2P sentencing. *See id.* We therefore think it evident that no substantive change was intended, and that the two multipliers continue to reflect a judgment that possessing P2P linked to the manufacture of methamphetamine is a more serious crime than possessing it in other circumstances.[15]

Although the new language left room for Campbell's argument here,[16] the legislative history satisfies us that the Sentencing Commission intended that a defendant who possesses P2P for the ultimate purpose of manufacturing methamphetamine is subject to the higher multiplier, regardless of who actually makes the methamphetamine. The district court's finding that Campbell possessed the P2P for that purpose is unassailable.

### IV. *Conclusion*

Having carefully considered each of the defendant's claims, we are unable to detect any reversible error in the district court's conduct of the trial or its decisions on sentencing. We wish to note, however, our sense that the sum of the parts here is a whole that is contrary to the age-old wisdom that "the punishment should fit the crime." Campbell, who is now 46, will serve 24 years in prison for—at base—producing a quantity of P2P that would have allowed manufacture of very little methamphetamine. Under Congress's sentencing regime, we are obliged to endorse this harsh result. *See United States v. Jackson,* 30 F.3d 199, 204–05 (1st Cir.1994) (Pettine, J., concurring) (pursuant to guidelines' "mechanical sentencing," 40-year-old defendant must serve "de facto life sentence" of 27 years).

15. Trial testimony established that P2P has no legitimate commercial use, and typically is used only to make amphetamine or methamphetamine.

*Accordingly, the district court's judgment is affirmed in all respects.*

erences to amounts of marijuana. *Id.* at amend. 396.

16. We note that Campbell's alternative reading could have been avoided with a slight change in phrasing: rather than "when possessed for the purpose of manufacturing methamphetamine," the provision could have provided that the 416 multiplier applied if the P2P was possessed "with intent that it be used for" manufacturing methamphetamine.