UNITED STATES of America,
Plaintiff–Appellee,

v.

Michael RUFF and Michael Raymond
Persyn, Defendants–Appellants.

No. 92–5523.

United States Court of Appeals,
Fifth Circuit.

Feb. 12, 1993.

Michael Ruff, pro se, Oakdale, LA

Donald Clowe, San Antonio, TX (court-appointed), for Michael Persyn.

Daniel P. McCarthy, San Antonio, TX (court-appointed), Diane D. Kirstein, Richard L. Durbin, Jr., Asst. U.S. Attys., Ronald F. Ederer, U.S. Atty., San Antonio, TX, for Michael Ruff.

Before POLITZ, Chief Judge, GARWOOD and DAVIS, Circuit Judges.

GARWOOD, Circuit Judge:

This appeal compels us to examine once again the question of whether a sentencing judge may consider the entire amount of a mixture containing a detectable amount of methamphetamine rather than only the actual weight of the illegal substance within the mixture. Although we acknowledge that this case presents a slightly different factual situation than those we have previously addressed, the rule adopted by this Circuit applies equally here to require that the entire amount be considered. We affirm the district court's ruling on this issue.

We affirm, with one exception, on the remaining issues before us.

### Factual Background and Proceedings Below

San Antonio, Texas, police officer John Langerlaan (Langerlaan), a deputized special agent for the Drug Enforcement Administration (DEA), was working undercover on November 28, 1990, when he met Cathy Wadle (Wadle) and Tedrick Portenier (Portenier), who told him they had established an amphetamine laboratory and gave him a list of the chemicals and laboratory equipment that they needed to manufacture amphetamine and methamphetamine. Langerlaan informed Wadle and Portenier that he could help them procure the necessary materials.

On November 30, Langerlaan delivered some ether to Wadle; she gave him a small amount (approximately one-eighth ounce) of amphetamine as a gratuity for the ether. Wadle told him that the laboratory was on a farm near Devine, Texas. Surveillance measures taken by Langerlaan and other agents revealed that Portenier obtained the ether from Wadle that evening and drove to Castroville, Texas, where he met with an individual driving a gray 1989 Mazda pickup truck, which was registered to defendant-appellant Michael Ruff (Ruff).

Langerlaan met with Portenier on December 1 and agreed to furnish him with acetic anhydride, which Portenier needed to start a new manufacturing process. Portenier gave Langerlaan a five or six gram sample of methamphetamine. In subsequent conversations with Langerlaan, Portenier and Wadle implicated Ruff and defendant-appellant Michael Persyn (Persyn) as partners with Portenier in the manufacturing of amphetamine and methamphetamine; Portenier identified Persyn as the owner of the farm where the laboratory was located.

On December 19, 1990, Langerlaan delivered some laboratory equipment and a container of acetic anhydride to Portenier; the container had a false bottom, in which Langerlaan had placed a tracking device. Surveillance agents followed the tracking device to Ruff's house and later to Portenier's residence.

On December 28, on the pretext that he had not been paid for the ether, Langerlaan persuaded Wadle to show him the location of the farm where the laboratory was located. During the drive to the farm, Wadle informed him that she had been to the farm on two occasions in November 1990 and had seen a fully functional amphetamine laboratory upon her first visit in the early part of that month. The mailbox in front of the farmhouse bore the letters "M & L Persyn." Langerlaan and Wadle did not stop at the farm on that day, ostensibly because Langerlaan did not want to get Wadle mixed up in his payment problems.

Based upon these events, as well as further meetings and conversations with Portenier, Langerlaan obtained search warrants for the residences of Portenier, Wadle, Ruff, and Persyn. These warrants were executed on January 17, 1991. Papers and phone lists were found linking these four individuals together; drug paraphernalia was found at Persyn's and Wadle's houses. At the farm, the agents found the remnants of a laboratory containing precursor chemicals, ether, and jars of liquids containing phenylacetone (P2P) and methamphetamine.

A superseding indictment[1] charged Portenier, Wadle, Ruff, and Persyn with (1) conspiracy to manufacture amphetamine and methamphetamine; and (2) conspiracy to distribute amphetamine and methamphetamine. Persyn was charged with an additional count of possession of P2P with intent to manufacture methamphetamine (count three). Ruff pleaded guilty to the manufacturing conspiracy charge; Persyn was convicted in a jury trial of all three counts.[2]

---

1. The original indictment charged all four with two counts: (1) conspiracy to manufacture amphetamine; and (2) conspiracy to distribute amphetamine.

2. Wadle and Portenier entered plea agreements with the government; they are not parties to the present appeal. Ruff, Wadle, and Portenier all testified for the government at Persyn's trial.

Persyn challenges his conviction based on the validity of the search warrant for his residence and the sufficiency of the evidence on count three; he challenges his sentence on the grounds that the district court erred in including the entire amount of liquids containing mere traces of methamphetamine for the purposes of calculating his base offense level. Ruff contends that he was not involved in the methamphetamine aspect of the conspiracy and that therefore it was error for the district court to consider the methamphetamine and P2P found at the laboratory in assessing his sentence.

## Discussion

### I. *Persyn's Claims on Appeal*

#### A. Validity of Search Warrant

■ Persyn argues that the district court erred in denying his motion to suppress the evidence seized from his farm because the search warrant did not, on its face, reveal probable cause. He contends that the search warrant was based on stale information provided by Wadle; Persyn also challenges Wadle's reliability as an informant.

■ An allegation that the information supplied in an affidavit for a search warrant is stale is to be considered on the facts of each case. *United States v. Webster*, 734 F.2d 1048, 1056 (5th Cir.1984). Such a finding depends upon "the nature of the unlawful activity and, when the information of the affidavit clearly shows a long-standing, ongoing pattern of criminal activity, even if fairly long periods of time have lapsed between the information and the issuance of the warrant, the information need not be regarded as stale." *Id.* Here, it was clear from the affidavit's recital of Langerlaan's conversations with Portenier that the conspirators were engaged in manufacturing amphetamines and methamphetamines on an ongoing basis. The affidavit reflects that at their first meeting, Portenier requested some ether to complete a man-

ufacturing process;[3] shortly thereafter, he asked for acetic anhydride to begin a new batch. Nothing suggested either that the conspirators would not continue in their operation or that the laboratory would be moved. Further, the delay from December 28, 1990, when, as the affidavit reflects, Wadle told Langerlaan that she had seen the laboratory in actual operation in "the first part of November, 1990" and had seen the functional laboratory again (though not while actually in operation) the week before Thanksgiving, until January 16, 1991, when the warrant was obtained, is not significant in light of the affidavit's recitals that Langerlaan continued to meet with Portenier and to gather information from him during that time. The information provided by Langerlaan in his search warrant affidavit was not stale.

■ In any event, the results of the search were admissible, even if the affidavit was in some way deficient, under the Supreme Court's holding in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), allowing the admission of evidence seized in reasonable, good-faith reliance on a search warrant that is later found to be defective. *Leon*, 468 U.S. at 905, 104 S.Ct. at 3411. In setting forth this exception to the exclusionary rule, the Court noted that suppression remains an appropriate remedy: (1) if the magistrate or judge issuing the warrant relied upon a deliberately or recklessly false affidavit; (2) if the magistrate wholly abandoned his judicial role and did not act in a neutral and detached manner; (3) if the warrant was based upon an affidavit so lacking any indicia of probable cause that official belief in its existence would be unreasonable; and (4) if the warrant itself was facially deficient so that executing officers could not reasonably presume it to be valid. *Id.* at 923, 104 S.Ct. at 3421. Persyn does not claim that any of these situations occurred in the present case, nor does our review of the record suggest any basis for so concluding.

---

**3.** Ether is used to "powder out" the amphetamine or methamphetamine from the liquid stage of the manufacturing process.

The district court did not err in denying Persyn's motion to suppress the evidence seized at the farm pursuant to the search warrant.

### B. Possession of P2P

█ Persyn filed a motion to dismiss or for an instructed verdict as to count three of the superseding indictment, which charged that "on or about January 17, 1991" Persyn did "possess" phenylacetone (P2P) "with the intent to manufacture a quantity of methamphetamine." Persyn asserted, as he does on appeal, that the government's evidence revealed that the amount of P2P found on that date was insufficient to manufacture methamphetamine. The district court denied the motion, and the jury convicted Persyn of this count. Persyn now claims that the evidence is insufficient to sustain this conviction.

The only evidence of P2P produced at trial was the P2P found in liquids seized at the farm laboratory on January 17, 1991. DEA agent Tom Wade testified that he had taken samples from the jars of liquids found at the laboratory on that date and had made estimates of the amounts of these liquids. DEA chemist William Glanville testified that eight of these samples contained P2P; the gross amounts of the liquids from which these eight samples were taken equalled approximately one hundred ounces. Glanville testified upon cross-examination, however, that the net amount of the P2P in each of these eight samples was a mere trace, too small to measure. He stated that these solutions were probably the residue from a manufacturing process and admitted that the amounts of P2P found were insufficient for use in manufacturing either amphetamine or methamphetamine.

Although it might well be possible to infer from the evidence of P2P residue that Persyn *had* possessed P2P with the intent to manufacture methamphetamine (and had in fact used P2P for that purpose), the date alleged in the superseding indictment for count three was "on or about January 17, 1991." The P2P that Persyn possessed on that date, however, was insufficient to manufacture methamphetamine.

There is nothing in the record to suggest that the government tried this case on any theory other than that count three was based on the P2P solutions found at the laboratory on January 17. There was no direct evidence of an earlier possession, nor was there any clear attempt to show that Persyn had possessed P2P at an earlier time.[4]

Because the only P2P that the evidence shows Persyn possessed as alleged was not enough for manufacturing purposes, we must reverse Persyn's conviction on count three of the superseding indictment, as he could not have possessed that P2P with the intent to manufacture methamphetamine.

### C. Quantities of Methamphetamine and P2P

█ Persyn claims that it was error for the district court to consider the entire weight of the mixtures containing methamphetamine and P2P for sentencing purposes because these liquids contained only a trace of the controlled substances.

---

**4.** There is a passing reference in Portenier's testimony that he detected the smell of "PTP" (presumably P2P) at the laboratory in early November 1990. The district court instructed the jury that it was not necessary that the possession of P2P occur on the exact date alleged in the indictment (January 17, 1991), and that the evidence would be sufficient if it established that the offense was committed on a date reasonably near the date alleged. While the instructions did not explain what a reasonable time would be, we do not believe that under the facts of this case possession of P2P in the early part of November 1990 is reasonably near January 17, 1991. There is no proof that the P2P detected by Portenier in early November was the source of, or from the same batch or acquisition as, the traces of P2P found in the laboratory in mid-January. Absent this proof, the possession in November could be a separate offense and not part of the charged offense. *See United States v. Vaughn*, 859 F.2d 863 (11th Cir.1988) (discussing requirement of proof of separate possessions of controlled substances in order to sustain consecutive sentences on separate charged possessions), *cert. denied*, 490 U.S. 1065, 109 S.Ct. 2064, 104 L.Ed.2d 629 (1989).

We will uphold a sentence imposed under the sentencing guidelines so long as it results from a correct application of the guidelines to factual findings that are not clearly erroneous. *United States v. Alfaro*, 919 F.2d 962, 964 (5th Cir.1990). We review the district court's legal determinations *de novo*. *United States v. Mourning*, 914 F.2d 699, 704 (5th Cir.1990).

The law of this Circuit is that a defendant's sentence is based upon the entire weight of a mixture containing a detectable amount of methamphetamine or P2P rather than only the weight of the controlled substance. *See United States v. Sherrod*, 964 F.2d 1501, 1509–1511 (5th Cir.) (affirming sentence based upon entire amount of mixture containing methamphetamine), *cert. denied*, —— U.S. ——, 113 S.Ct. 832, 121 L.Ed.2d 701 (1992) and *cert. dismissed*, —— U.S. ——, 113 S.Ct. 834, 122 L.Ed.2d 111 (1992); *United States v. McKeever*, 906 F.2d 129, 133–134 (5th Cir.1990) (declining to consider dilution of substance containing P2P for drug conversion purposes), *cert. denied*, —— U.S. ——, 111 S.Ct. 790, 112 L.Ed.2d 852 (1991). While we acknowledge that there is a split among the circuits on this issue, *see Walker v. United States*, —— U.S. ——, 113 S.Ct. 443, 121 L.Ed.2d 362 (1992) (White, J., dissenting from denial of *certiorari*), we are bound by the decision of a prior panel, absent en banc reconsideration or a superseding contrary decision of the Supreme Court. *In re Dyke*, 943 F.2d 1435, 1442 (5th Cir.1991).

Persyn attempts to distinguish the present factual situation, claiming that because the traces of methamphetamine found at the farm were too small to measure, they may not be considered for sentencing purposes. This argument strives to rewrite the language of both the Drug Abuse Prevention statute[5] and the United States Sentencing Commission's Guidelines,[6] which speak of "detectable," rather than "measurable," amounts of methamphetamine. The plain meaning of the words "detectable amount" would include any quantity, however small, which can be discerned by accepted methods of analysis.

Although the amounts of methamphetamine and P2P found in some of the liquids seized at Persyn's farm were mere traces, the DEA chemist was nonetheless able to detect their presence within the mixture. As the liquids thus contained "detectable" amounts of these controlled substances, the district court properly considered the entire amount of the mixtures in calculating the base offense level.

Our attention has been called to the case of *United States v. One Gates Learjet, Serial No. 28004*, 861 F.2d 868 (5th Cir. 1988), in an effort to support the argument that a "measurable" amount of methamphetamine is required for sentencing purposes. There, the district court ordered forfeiture of an aircraft, finding that it had been used to transport controlled substances. The sole evidence of this illegal use, however, was a trace of cocaine found in the dust vacuumed from the airplane; this trace was visible only with the use of a microscope and was too small to measure except by sophisticated scientific procedures. *One Gates Learjet*, 861 F.2d at 869. A DEA chemist testifying for the government admitted that the quantity of cocaine could have been brought on board

---

**5.** This statute provides, *inter alia,* penalties for offenses involving certain quantities of "a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers." 21 U.S.C. § 841(b)(1).

**6.** A footnote to the Drug Quantity Table which follows U.S.S.G. section 2D1.1 provides:
"Unless otherwise specified, the weight of a controlled substance set forth in the table refers to the *entire weight of any mixture or substance containing a detectable amount of the controlled substance....* The terms 'PCP (actual)' and 'Methamphetamine (actual)' refer to the weight of the controlled substance, itself, contained in the mixture or substance. For example, a mixture weighing 10 grams containing PCP at 50% purity contains 5 grams of PCP (actual). In the case of a mixture or substance containing PCP or methamphetamine, use the offense level determined by the entire weight of the mixture or substance, or the offense level determined by the weight of the PCP (actual) or methamphetamine (actual), which ever is greater." 11 U.S.S.G. § 2D1.1, Footnote to Drug Quantity Table (1991) (emphasis added).

the airplane on the shoe of a passenger or crew member (and thus need not have been the residue of a load of cocaine transported by the aircraft). *Id.* at 872. This Court concluded that there was no showing of probable cause that would support forfeiture and reversed the order of the district court. *Id.* at 872–873.

The trace of cocaine at issue in *One Gates Learjet* was found insufficient to show that the aircraft had been used for an illegal purpose. In contrast, in the case before us, there is no doubt that the defendants were engaged in the illegal activity of manufacturing methamphetamine. Not only did the chemist in this case testify that the traces of methamphetamine and P2P found at Persyn's farm were probably the residue from a manufacturing process, but the admissions of Persyn's co-defendants, testifying for the government, reveal the illegal nature of the conspiracy.

Further, at issue here is Persyn's sentence. We are not forced to rely solely on these traces in order to sustain Persyn's *conviction* for conspiracy to manufacture and distribute amphetamine and methamphetamine.

Finally, we do not consider the district court's factual findings concerning the amounts of controlled substances involved for sentencing purposes to be clearly erroneous. In addition to the traces of methamphetamine and P2P seized at Persyn's farm, the government's evidence included other more substantial amounts of methamphetamine, amphetamine, and precursor chemicals, supporting the conclusion that the traces at issue were not casually present but were part of the result of the manufacturing process.

■ We affirm the district court's assessment of Persyn's sentence on counts one and two of the superseding indictment.[7]

## II. *Ruff's Claim on Appeal*

■ Ruff claims that the district court erred in accepting the probation officer's calculations of his base offense level in the presentence investigation report (PSI). Specifically, Ruff contends that the evidence revealed that his involvement in the conspiracy extended only to the manufacture of amphetamine and that he had nothing to do with the manufacturing of methamphetamine; he argues that it was error to include the methamphetamine and P2P found at the lab in the total amount of controlled substances used to calculate his base offense level.[8]

Ruff disregards the fact that he pleaded guilty to conspiracy to manufacture amphetamine *and methamphetamine*. At his plea hearing, the attorney for the government read the factual basis for the plea. This summary included allegations implicating Ruff in the conspiracy to manufacture methamphetamine: (1) Portenier stated that he was solicited by Ruff and Per-

7. Persyn was sentenced on each of the three counts to concurrent terms of 121 months' imprisonment followed by concurrent three year supervised release terms. No fine was levied on any count. A $50 special assessment was imposed on each. The presentence report, adopted by the district court, calculated the guideline range for each count wholly by reference to the range for the conspiracy counts (calculated by reference to the drug quantities), grouping all offenses together under U.S.S.G. § 3D1.2(d). There were no adjustments to the base offense level. The guideline range for each count was thus exactly the same, 121 months' to 151 months' imprisonment and 3 to 5 years' supervised release (likewise the statutory maximum for each count was 20 years). In these circumstances, our reversal of Persyn's conviction on count three does not require resentencing on counts one and two, as it is clear beyond doubt that nothing respecting count three influenced the sentences on the other counts.

8. The probation officer computed the offense level on the basis of the controlled substances found at Persyn's farm: 11.6 grams of amphetamine, 995.15 grams of methamphetamine, and 2858.85 grams of P2P. These substances, converted according to the Drug Equivalency Tables, are the equivalent of 2186.68 grams of heroin (under the 1990 Sentencing Guidelines, which were applied in Ruff's sentencing), an amount that yields a base offense level of 32. The district court reduced the base offense level two points for acceptance of responsibility and another four points upon the government's motion for a downward departure due to cooperation, resulting in an offense level of 26. Had the district court considered only the amphetamine, Ruff's base offense level would have been 12, prior to any reduction.

syn to help them find chemicals to be used in the manufacture of amphetamine and methamphetamine; (2) agents executing search warrants found documents that revealed the association among the four codefendants and that contained recipes and records for the manufacture and distribution of methamphetamine and amphetamine; (3) Portenier provided Langerlaan with samples of both amphetamine and methamphetamine; and (4) liquids seized at Persyn's farm were analyzed to contain P2P and methamphetamine. Further evidence of Ruff's involvement in manufacturing methamphetamine was provided by Wadle's testimony at Persyn's trial.

Ruff, under oath, agreed with the prosecutor's summary, admitting to the evidence pertaining to methamphetamine and to his association with the co-conspirators. He acknowledged that he understood that the government would be required to prove those facts beyond a reasonable doubt should he elect to proceed to trial. Ruff did not take advantage of the district court's offer to allow him to withdraw his plea and has not challenged this plea on appeal.

In his objections to the PSI and at his sentencing hearing, however, Ruff denied all involvement with the methamphetamine aspect of the conspiracy. Unlike his statements made at his plea hearing, these new assertions were not made under oath. *See United States v. Johnson*, 823 F.2d 840, 842 (5th Cir.1987) (holding that district court abused its discretion in relying exclusively on government attorney's version of the crime). Further, even if the district court considered this denial, it clearly accepted Ruff's sworn testimony at his plea hearing over his unsworn recantation at sentencing. We will not disturb the district court's credibility choices absent clear error, which we do not find here. *United States v. Doucette*, 979 F.2d 1042 (5th Cir. 1992). Finally, immediately after overruling Ruff's objections to the inclusion of the methamphetamine evidence for sentencing purposes, the district court once again gave Ruff the opportunity to withdraw his plea. This he declined to do.

Because we conclude that the district court's findings were not clearly erroneous, we affirm Ruff's sentence.

### Conclusion

For the reasons stated above, we affirm the district court's denial of Persyn's motion to suppress the evidence acquired pursuant to the search warrant issued for his farm. In addition, we affirm his conviction and sentence on counts one and two of the superseding indictment. We reverse Persyn's conviction and sentence on count three of that indictment. Finally, we affirm Ruff's conviction and sentence.

AFFIRMED as to Ruff; AFFIRMED in part and REVERSED in part as to Persyn.