The PEOPLE of the State of Colorado,
Plaintiff–Appellant,

v.

Wade Paul MILLER, Defendant–
Appellee.

No. 03SA107.

Supreme Court of Colorado,
En Banc.

Sept. 8, 2003.

Edward J. Rogers, District Attorney, Kathleen G. Eberling, Assistant District Attorney, Canon City, Colorado, Attorneys for Plaintiff–Appellant.

Josh T. Liles, Salida, Colorado, Attorney for Defendant–Appellee.

Justice HOBBS delivered the Opinion of the Court.

In this interlocutory appeal, filed pursuant to C.A.R. 4.1 and section 16–12–102(2), 6 C.R.S. (2002), the prosecution appeals the district court's order suppressing evidence of methamphetamine manufacture seized from defendant Wade Miller's home. Nearly a month expired between the event the informant related and application by the police for the warrant. The trial court set aside the warrant for lack of probable cause and suppressed the evidence seized—for lack of good faith police reliance on the sufficiency of the warrant—because the only information linking the illegal activity to the place to be searched, Miller's home, was stale. We agree with the trial court and affirm its suppression order.

## I.

On January 6, 2003, the police obtained and executed a search warrant for Miller's home. During the search, the police discovered a methamphetamine laboratory, arrested Miller, and charged him with possessing and operating the lab.[1]

The warrant was based on a police affidavit reciting information from an anonymous informant. The informant said that, on December 9, 2002, at Miller's home, he smoked some methamphetamine Miller had just finished manufacturing there. The informant also stated that Miller kept methamphetamine manufacturing supplies in his kitchen cabinets. The affidavit also recited another informant's information—current at the time of application for this warrant on January 6, 2003—that Miller was manufacturing methamphetamine at a location other than his home. But the affidavit (attached as Exhibit A) contained no information more current than December 9, 2002,[2] regarding manufac-

ture or the presence of contraband at Miller's home.

The record made at the suppression hearing discloses that the police obtained and executed warrants for the other location and Miller's home on January 6, but the affidavit for search of the other location inexplicably contains more current information regarding manufacture of the drug by Miller at his home than was contained in the affidavit for search of his home.

As to the affidavit for search of Miller's home, the trial court found that: (1) the police had recited sufficient reliable information to implicate Miller in the manufacture of methamphetamine; (2) but the information regarding drug manufacturing by Miller at his home was stale; and (3) the police could not have reasonably relied on it in applying for the warrant. The trial court concluded that the warrant lacked probable cause, and the good faith exception to the exclusionary rule did not apply because no reasonably objective police officer would have relied on the warrant's sufficiency. It therefore granted Miller's motion to suppress the evidence obtained from search of his home.

## II.

We agree with the trial court that the warrant in this case was not based on probable cause, and the police could not have reasonably relied on it, because the information regarding drug manufacturing at Miller's home was stale when the police applied for the warrant, and no reasonable police officer would have relied on it. Accordingly, the exclusionary rule operates in this case, not the good faith exception to it.

### A. Deficient Warrant and the Good Faith Exception

█ When reviewing a suppression order, we defer to the trial court's findings of facts,

---

1. Based on the search of his home, the Amended Information charged Miller with manufacturing a schedule two controlled substance, possession of manufacturing chemicals or supplies, possession of a schedule II control substance, and unlawful possession of a schedule II controlled substance. § 18–18–405(1), (2)(a), 6 C.R.S. (2002). The prosecution also charged Miller

with identical counts, based on the search of the residence of Miller's friend. The validity of this other search warrant is not before us.

2. On August 14, 2002, the police previously searched Miller's home pursuant to a warrant and seized evidence of methamphetamine manufacturing there.

if supported by the record; and we review the trial court's legal conclusions de novo. *People v. Schall,* 59 P.3d 848, 851 (Colo.2002); *People v. D.F.,* 933 P.2d 9, 13–14 (Colo.1997).

We address this case using the framework set forth by *People v. Randolph,* 4 P.3d 477, 482 (Colo.2000), and *People v. Altman,* 960 P.2d 1164, 1167 (Colo.1998). *Randolph* upheld a trial court's suppression order because the warrant there lacked probable cause and the police, under the circumstances in that case, could not have reasonably relied on it. In contrast, *Altman* applied the good faith exception and allowed the evidence to be admitted at trial, even though it was derived from execution of a warrant that may have lacked probable cause.

The application for the warrant in *Randolph* failed to particularize the building where the evidence of illegal activity might be found; pertinent here, the anonymous tip received in that warrant was stale (two months old). We concluded that the police could not have reasonably believed that the "bare bones" affidavit they presented to the magistrate in that case established probable cause.

In contrast, the affidavit in *Altman* contained recent information the police had personally observed, suggesting a reasonable inference that the defendant was growing marijuana in his home.

> Officer Landolt's experience and training led him to believe that the purchase of equipment commonly associated with indoor marijuana cultivation at the height of the outdoor growing season, the high electrical usage, the potentially suspicious use of a rental car, and the defendant's previous brushes with the law all created a reasonable inference of marijuana cultivation.

*Altman,* 960 P.2d at 1172. Though the warrant may have lacked probable cause, an issue we did not reach because of the applicability of the good faith exception, we concluded that police reliance on the warrant in *Altman* was objectively reasonable.

 The test for good faith reliance on the warrant imposes upon the officer involved in obtaining and executing the search warrant a continuing duty to exercise reasonable professional judgment. *Randolph,* 4 P.3d at 483. The officer must read the affidavit and warrant carefully and must be objectively persuaded that the warrant is sufficient. *Id.* In determining whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization, a reviewing court should take all the circumstances surrounding the issuance of the warrant into account. *Id.*

As we did in *Randolph,* we now address the law of probable cause and the good faith exception for police reliance on a warrant. Then, we apply that law to the warrant and the seizure of evidence in this case.

### B. Probable Cause

 The Fourth Amendment to the United States Constitution and article II, section 7, of the Colorado Constitution prohibit the issuance of a search warrant except upon probable cause supported by oath or affirmation particularly describing the place to be searched and the things to be seized. U.S. Const. amend. IV; Colo. Const. art. 2, § 7; *see also* § 16–3–303, 6 C.R.S. (2002) (specifying the requirements for a search warrant). Because there is no mechanical formula for determining probable cause, reasonable minds may differ on the question of whether a particular affidavit establishes probable cause. *Altman,* 960 P.2d at 1167. A reviewing court should uphold the validity of a warrant if the affidavit accompanying the warrant creates a substantial basis for the conclusion that probable cause existed. *People v. Reed,* 56 P.3d 96, 101 (Colo.2002).

 The warrant must establish probable cause to believe that contraband or evidence of criminal activity is located in the place to be searched at the time of the warrant application, not merely some time in the past. *People v. Erthal,* 194 Colo. 147, 570 P.2d 534 (1977). Probable cause exists when an affidavit for a search warrant alleges sufficient facts to warrant a person of reasonable caution to believe that contraband or evidence of criminal activity is located at the place to be searched. *Altman,* 960 P.2d at 1167.

To determine whether probable cause exists, we examine the totality of the circumstances. *Id.* This analysis does not lend itself to mathematical certainties or bright line rules; rather, it involves a practical, common-sense determination whether a fair probability exists that a search of a particular place will reveal contraband or other evidence of criminal activity. *Id.*

Whether information is current or stale plays an important role in the totality of the circumstances analysis. *See Randolph,* 4 P.3d at 482; *People v. Meraz,* 961 P.2d 481, 484 (Colo.1998); *People v. Hearty,* 644 P.2d 302, 311 (Colo.1982); *see also People v. Green,* 70 P.3d 1213, 1215 (Colo.2003) (warrant was obtained one day after the defendant was seen wearing the stolen item). Whether the information is stale and cannot support probable cause depends on the factual circumstances and the type of crime.[3] *People v. Lubben,* 739 P.2d 833, 836 (Colo. 1987) ("In determining whether information is stale, the court must consider the type of crime the facts reveal.").

## C. Good Faith Exception

Typically, when the police conduct a search without a valid warrant, the exclusionary rule operates to suppress the fruits of the search, unless the search falls under an exception to the warrant requirement. *People v. Winpigler,* 8 P.3d 439, 443–44 (Colo.1999). The exclusionary rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the aggrieved; whether to invoke the exclusionary rule is an issue separate from the question of whether Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct. *United States v. Leon,* 468 U.S. 897, 906, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Application of the exclusionary rule is restricted to those areas where its remedial objectives are thought most efficaciously served. *Id.* at 908, 104 S.Ct. 3405.

As a result, the exclusionary rule does not apply to situations where the police act in objectively reasonable, good faith reliance on a warrant, even if a court later holds that the warrant is defective. *Randolph,* 4 P.3d at 483. In such circumstances, excluding the fruits of the search would not have a deterrent effect on the police. *Leon,* 468 U.S. at 919–20, 104 S.Ct. 3405.

The Colorado General Assembly has codified a version of the *Leon* test that permits admission of otherwise suppressible evidence if the evidence was seized "as the result of a good-faith mistake or of a technical violation." § 16–3–308(1), 6 C.R.S. (2002). The *Leon* "objectively reasonable" standard and the statutory "good faith" standard are substantially similar. *Randolph,* 4 P.3d at 483; *People v. Leftwich,* 869 P.2d 1260, 1272 (Colo.1994). Colorado's statute, however, creates a presumption that an officer was acting in good faith if he or she acted pursuant to a warrant. *See* § 16–3–308(4)(b), 6 C.R.S. (2002); *Randolph,* 4 P.3d at 483. This presumption may be rebutted if the officer failed to undertake the search in an objectively good faith belief that it was reasonable. *Randolph,* 4 P.3d at 483; *Altman,* 960 P.2d at 1169. If no reasonable officer would have relied upon the warrant, then objective good faith is absent and the good faith exception offers no shelter. *Altman,* 960 P.2d at 1169.

Accordingly, the police must act in objective good faith when they apply for the warrant; the fact that a magistrate ultimately approved the warrant is not controlling.

[T]he fact that a magistrate acted favorably upon a warrant request is of no moment in the determination of whether the officer acted with objective reasonableness because *the question of reasonableness is to be judged as of the time of warrant application* and thus without consideration of the fact that the magistrate thereafter issued a warrant.

---

**3.** The type of evidence and activity involved is important. Some types of evidence the police seek to obtain through a search warrant may be relatively immune from becoming stale, for example, DNA evidence at the specified location.

*Leftwich,* 869 P.2d at 1269 n. 11 (emphasis added); *accord Malley v. Briggs,* 475 U.S. 335, 345, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (the *Leon* analysis focuses on "whether a reasonably well-trained officer ... would have known that his affidavit failed to establish probable cause and *that he should not have applied for the warrant.*")(emphasis added); *see Altman,* 960 P.2d at 1169 n. 3.

■ There are four circumstances under which an officer may not reasonably rely on a warrant: (1) where the issuing magistrate was misled by a known or recklessly made falsehood; (2) where the issuing magistrate wholly abandoned the judicial role; (3) where the warrant is so facially deficient that the officer cannot reasonably determine the particular place to be searched or things to be seized; or (4) where the warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. *Leon,* 468 U.S. at 923, 104 S.Ct. 3405; *Randolph,* 4 P.3d at 483–84. We have characterized warrants that fall under the fourth circumstance as "bare bones" warrants. *E.g., Randolph,* 4 P.3d at 482.

This case implicates the fourth circumstance, because the trial court found that the information in the affidavit was stale, and, consequently, the police could not have reasonably believed that it established probable cause for the search of Miller's house.

### D. Application In This Case

#### 1. Lack of Probable Cause

■■ A proper search warrant affidavit must allege sufficient facts to warrant a person of reasonable caution to believe that evidence of criminal activity is located at the place to be searched. *Leftwich,* 869 P.2d at 1265. Although the affidavit for the warrant in this case alleged past criminal activity at Miller's residence, it did not tie any current criminal activity or the presence of contraband to Miller's residence.

The affidavit for the warrant related information that Miller was engaged in a course of manufacturing methamphetamine, but the most recent event of affidavit-alleged criminal activity occurring at Miller's residence was nearly a month old at the time the police applied for the warrant. As the trial court found, the affidavit related two stale allegations of criminal activity at Miller's home: the fact that he was arrested there in August 2002 after the police found a methamphetamine lab on the premises, and the fact that an anonymous informant on December 9, 2002, told the police he had smoked methamphetamine at Miller's house and observed Miller in the process of manufacturing a batch of methamphetamine.

Thus, the most recent evidence of criminal activity at Miller's residence was almost a month old when the police applied for the warrant on January 6, 2003. The affidavit contains no information indicating that the police attempted to ascertain whether Miller's illegal activity at his residence continued after the informant's visit, or to corroborate the informant's statements. The affidavit relates one unsuccessful attempt to verify that Miller continued to live at the house to be searched.[4]

Under these circumstances, the excessive delay between the informant's December 9, 2002 observations and the police application of January 6, 2003 for the warrant renders the information stale and unreliable. *See Randolph,* 4 P.3d at 482 (evidence that the defendant smoked methamphetamine at his house was stale, as it occurred "only some time in the last two months."); *People v. Stoppel,* 637 P.2d 384, 391 (Colo.1981) (month-old observations by non-anonymous informant that the defendant had bomb making supplies in his residence were stale and insufficient to support probable cause).[5]

---

4. The affidavit reports that a police officer went to the house and saw a vehicle registered to "James E. and Marsha L. Miller" parked at the residence. The affidavit provides no basis to believe that "James" Miller is the same person as "Wade" Miller. In addition, the affidavit does not state when the police made this observation, so the information is presumptively stale. *See*

*Randolph,* 4 P.3d at 482 (affidavit's account of a witness statement is stale, because it did not include the time frames when the witness made his observations).

5. *People v. Erthal,* 194 Colo. 147, 570 P.2d at 534 (1977) is instructive on this point. In that case, the defendant was accused of stealing some tools

The current information contained in the affidavit about Miller's illegal drug manufacturing activity related to a different location from his home. The affidavit recites that on January 3, 2003, a few days before the police searched Miller's house, a different anonymous informant informed police that Miller was manufacturing methamphetamine at a trailer located elsewhere.[6] The information from that informant related intimate and detailed knowledge of Miller's manufacturing activities and did not mention anything about Miller manufacturing the drug at his house, or storing it there. In fact, Miller was arrested and charged for manufacturing methamphetamine at the other location as a result of the search conducted there pursuant to a separate warrant issued the same day as the warrant for search of his home. However, the warrant for search of Miller's home set forth nothing but stale information regarding manufacture at his home.

In contrast to the month involved here, our course of conduct cases address a much shorter time between the occurrence of criminal activity set forth as the basis for the warrant and the police application for the warrant. *People v.Schmidt*, 172 Colo. 285, 473 P.2d 698 (1970), involved evidence that a defendant was continuously dealing drugs from his room, and a lapse of five days between the time that an informant saw drugs in the room and the time that the police sought the warrant. *Id.* at 292, 473 P.2d at 701. Likewise, *People v. Hearty*, 644 P.2d 302 (Colo.1982), involved a lengthy conspiracy to extort money, corroborated by a series of transactions over several months, with the final transaction occurring eight days before the police sought a search warrant. *Id.* at 311.

In *People v. Ball*, 639 P.2d 1078 (Colo. 1982), the police observed literally hundreds of suspected drug transactions at the defendant's residence, with the last transaction

seven days before the police sought a warrant. *Id.* at 1080, 1083. Finally, in *Lubben*, 739 P.2d 833 (Colo.1978), the affidavit involved a situation in which the police found methamphetamine in the defendant's residence in April; received additional information that the defendant possessed methamphetamine or drug paraphernalia in November and December of the same year; conducted "sporadic surveillance" of the defendant in December and observed unusually heavy foot traffic to and from the defendant's residence; and received a tip from an informant that seventy-two hours before they applied for a search warrant, the informant saw methamphetamine in the defendant's residence. *Id.* at 836.

Here, the affidavit mentions two instances of illegal drug manufacture at Miller's house, one four months old and one nearly a month old. The mobility of this type of drug manufacturing is evident from the facts of this case. The affidavit recites that Miller was manufacturing methamphetamine at various places in the past. As our case law demonstrates, without relatively current information of criminal activity or contraband at the location to be searched, probable cause is typically lacking for issuance of the warrant.

The warrant for search of Miller's home lacked probable cause. We now address whether the good faith exception to the exclusionary rule should apply to this case.

## 2. Inapplicability of Good Faith Exception

In the vast majority of cases where a substantial basis for determining probable cause does not exist, the police cannot rely on the good faith exception:

> [I]n the vast majority of cases, if a court ... ascertains that a substantial basis for determining probable cause did not exist,

---

from a former employer. The police observed similar tools in the defendant's shop shortly after the theft. However, they waited two months before obtaining and executing a warrant to search the defendant's shop. We held that this two-month-old observation was stale, and did not support probable cause. *Id.* at 535. "Due to the lapse of nearly two months between the deputy's observation ... and the issuance of the warrant, there was no probable cause to believe that sto-

len goods were in the shop at the time the warrant was executed." *Id.*

6. This second informant also told the police that Miller was manufacturing at several other locations; however, the informant did not tell the police when Miller was manufacturing at those locations, so these additional allegations are stale.

the court will reach the conclusion that the officer unreasonably relied on the affidavit. *Leftwich,* 869 P.2d at 1271 n. 12.

 Application of the good faith exception to allow evidence that would be suppressed otherwise turns on whether it was "objectively reasonable" for the officer to rely on the warrant. *Id.* Thus, police officers involved in obtaining and executing a search warrant have a continuing duty to exercise reasonable professional judgment. *Randolph,* 4 P.3d at 483; *Altman,* 960 P.2d at 1170. The good-faith exception requires officers to have a reasonable knowledge of what the law prohibits. *Leon,* 468 U.S. at 919 n. 20, 104 S.Ct. 3405.

The affidavit in this case is a "bare bones" affidavit regarding the existence of the crucial link between the place to be searched and current information of criminal activity or the presence of contraband there.[7] *Randolph,* 4 P.3d at 482. As the trial court observed, the affidavit is bereft of current information about illegal activity at Miller's house:

> The "good faith" exception does not cure this deficiency. The affidavit is devoid of any information indicating current illegal activity at [Miller's house]. Official belief in the existence of information showing current illegal activity at [Miller's house] would be objectively unreasonable based on the information in the affidavit.

A reasonably well-trained police officer is held to know that an affidavit without any relatively current information of illegal activity or the presence of contraband at a residence does not create probable cause to search the residence. Consequently, we agree with the trial court that the police did not reasonably rely on the warrant.

 The prosecution urges us to consider information outside the affidavit to establish that the police met the objective good faith standard for admission of the seized evidence.[8] This information was included in the affidavit to search the house of Miller's friend, or was discovered as a result of that search, and was "overlooked" in the affidavit for this warrant.[9] However, like the trial court, we are restricted to the information contained within the four corners of the affidavit. *See Reed,* 56 P.3d at 101 (courts must consider whether reliance on the warrant was objectively reasonable, based on the contents of the warrant, and cannot inquire into

---

7. We emphasize that there is no bright line rule for counting of days in considering whether the affidavit is based on stale information. When the information in the affidavit focuses on one location, demonstrates ongoing activity over several months at that place, and the search warrant is for that place, courts have held that observations dating back more than one month were not stale. For example, the court in *United States v. Iiland,* 254 F.3d 1264, 1268–69 (10th Cir.2001)(activity ongoing over a considerable period of time) pointed out that the "affidavit tended to show that Mr. Iiland kept the drugs he sold in the storage unit, and that he was still renting and visiting the unit a few days before the warrant was issued." Another court pointed out that "[n]othing suggested either that the conspirators would not continue in their operation or that the laboratory would be moved." *United States v. Ruff,* 984 F.2d 635, 638 (5th Cir.1993). In *United States v. Le,* 173 F.3d 1258, 1266 (10th Cir. 1999), the reports of two informants were consistent in stating ongoing activity at the place to be searched. In contrast, the affidavit in the case before us placed the ongoing drug manufacturing at a different location from the place to be searched.

8. The prosecution's brief to us argues that the officer who sought and executed the warrant acted in objective good faith, in part because "he possessed more knowledge of criminal activity at [Miller's house] than he stated in his warrant; to wit: that he personally spoke with another informant on December 20, 2002, who told him that Miller continues to manufacture methamphetamine *in his home.*" (emphasis in original). People's Opening Brief at 8, *People v. Miller,* No. 03SA107.

9. For example, the warrant for the friend's house recites that an informant told the police on December 20 that Miller had continued to manufacture methamphetamine since his August arrest, and Miller primarily manufactures at his home and at his friend's residence. The People urge us to consider this information, arguing:

> A comparison of Officer Lopez's probable cause affidavit for the search of [Miller's residence] and Deputy Jolliffe's probable cause affidavit for the search of [Miller's friend's residence] clearly demonstrate that the two officers shared information and worked together in composing their affidavits. It is also clear that Officer Lopez simply *overlooked stating an important detail* when composing his affidavit. (emphasis added). People's Opening Brief at 6.

the police's subjective good faith). Thus, we decline to bolster the insufficient affidavit in this case with additional information not conveyed to the magistrate in the application for this warrant.

Given the facts of this case, applying the exclusionary rule to suppress the evidence seized has the salutary effect of requiring the police to use in the affidavit for the search warrant current information they have available, or may obtain, to establish the link between the place to be searched and the existence of criminal activity or contraband there. Establishing this link is at the heart of Fourth Amendment protections.

### III. Conclusion

Accordingly, we affirm the trial court's suppression order and remand this case for further proceedings consistent with this opinion.

Justice COATS dissents, and Justice KOURLIS and Justice RICE join in the dissent.

Justice COATS, dissenting:

Today the court declares inadmissible, as the product of an illegal search, the physical evidence of the defendant's manufacture of methamphetamine in his home. The majority does so despite discovery of the evidence during the execution of a warrant to search the defendant's home, issued by a neutral magistrate, in reliance upon a three and one-half page, single-spaced, typewritten affidavit, and despite acknowledging a finding of sufficient reliable information in the affidavit to implicate the defendant in the manufacture of methamphetamine. Although the affidavit undeniably alleges observations of the defendant's continuous, and very recent, production of methamphetamine at a number of locations, the majority finds fatal to the search of his home the failure of the affidavit to document observations at that specific location for almost a month. Because I believe the majority opinion betrays a fundamental misunderstanding of the purpose and scope of the staleness inquiry; amounts to a substantial departure from the precedent of not only this court but federal and state courts

across the country; and evinces a general hostility toward the good faith exception to the exclusionary rule, I respectfully dissent.

Ordinarily, it would be enough for reversal of a suppression order that the search fell within the good faith exception to the exclusionary rule. *People v. Altman*, 960 P.2d 1164 (Colo.1998). Because of the majority's staleness analysis, however, I feel obliged to explain why there was actually a substantial basis for the magistrate's finding of probable cause and issuance of the warrant. Although I do not consider the existence of probable cause to search the defendant's home a close question in this appeal, I do consider it important to emphasize that a warrant is not erroneously issued at all as long as there is at least a "substantial basis" to support it. *People v. Gall*, 30 P.3d 145, 150 (Colo.2001).

While specific statutes or rules may impose formal time limitations on the execution of a search warrant, *see, e.g.*, § 16–3–305(6), 6 C.R.S. (2002) (ten days from date of issuance); Crim. P. 41(d)(V)(VI) (same), the Fourth Amendment has never been construed to assign a life-span to information disclosing the commission of a crime. "Staleness" is simply a concept that expresses the reality that information making it likely that items connected to a crime will be found at a particular time and place may lose its force with the passage of time. Information amounting to probable cause to search for evidence of a crime at a particular point in time may therefore no longer amount to probable cause to search at a later point in time. Probable cause, however, "is not determined by merely counting the number of days between the time of the facts relied upon and the warrant's issuance." *United States v. Rahn*, 511 F.2d 290 (10th Cir.1975). Rather, the likelihood that evidence of a crime will still be found in the same place is a function of a host of variables that are unrelated to the calendar. *See Andresen v. State*, 24 Md.App. 128, 331 A.2d 78 (1975). Chief among them is the nature of the criminal activity at issue.

Along with virtually every other jurisdiction considering the question, we have often acknowledged that the passage of time becomes less significant where information indi-

cates criminal activity of a protracted or continuous nature. *See, e.g., People v. Erthal,* 194 Colo. 147, 570 P.2d 534 (Colo.1977) ("There was no information that the suspect continuously engaged in criminal activity or continued to use feloniously obtained tools, factors which might have justified the belief that the stolen items would still be in the location searched."); *United States v. Johnson,* 461 F.2d 285 (10th Cir.1972) (time has no meaning in determining probable cause apart from the nature and length of criminal activity and the nature of property to be seized). Time lapses running weeks, or even months, have been upheld where affidavits for search warrants indicated probable cause of ongoing criminal enterprises, of a wide variety. *See generally* 2 Wayne R. LaFave, *Search & Seizure* § 3.7(a), 344–46 nn. 17–26 (3d ed.1996) (illegal paramilitary operations, gambling operations, ongoing fraud or loan-sharking operations, ongoing processing or repeated sales of drugs, liquor, or guns, repeated thefts or receipt of stolen property).

Especially with regard to illegal drugs, probable cause of ongoing sales and production has been expressly distinguished from probable cause of mere use. *Compare Andresen,* ("The observation of half-smoked marijuana cigarette in an ashtray at a cocktail party may well be stale the day after the cleaning lady has been in ....") *with United States v. Hyde,* 574 F.2d 856 (5th Cir.1978) (holding in context of widespread and continuing conspiracy to smuggle drugs, "The upshot of this rule to practical application has been to allow fairly long periods of time to elapse between information and search warrant of criminal activity.") In light of the nature of the manufacturing or growing process and the nature of a conspiracy or enterprise to produce and/or sell drugs, information that is months old has regularly been held sufficient to establish probable cause to support a search. *See, e.g., United States v. Iiland,* 254 F.3d 1264 (10th Cir.2001) (three months since cocaine sale); *United States v. Smith,* 266 F.3d 902 (8th Cir.2001) (three months since cocaine sale); *United States v. Ruff,* 984 F.2d 635 (5th Cir.1993) (two months since observation of meth lab); *United States v. Dixon,* 247 F.Supp.2d 926 (S.D.Ohio 2002) (two months since cocaine

sale); *United States v. Seibert,* 779 F.Supp. 366 (E.D.Pa.1991) (three months since meth sale at defendant's trailer); *Lovett v. Commonwealth,* 103 S.W.3d 72 (Ky.2003) (two months since observation of meth lab); *State v. Hage,* 568 N.W.2d 741 (N.D.1997) (four months since supplier of meth lab ingredients named); *State v. Wilson,* 120 Or.App. 382, 852 P.2d 910 (1993) (six weeks since observation of meth lab); *People v. Wilson,* 182 Cal.App.3d 742, 227 Cal.Rptr. 528 (1986) (six weeks since observation of strong odor of meth).

The affidavit in this case indicated ongoing operations. It made clear that the affiant officer had already seized a meth lab from the defendant's home in August, as a result of which the defendant was charged with manufacturing and distributing and was released on bond. It also contained detailed information from an informant who had been in the defendant's home in December, four months later, that the defendant was still regularly manufacturing methamphetamine at both his home and the Orchard location. The affidavit further contained detailed information from another informant from early January, just days before the issuance and execution of the warrant, that the defendant and another man were continuing to manufacture methamphetamine at the Orchard address, as well as several other locations. Unlike the majority, I consider it permissible to infer from this information that the defendant had not, in the last month, mysteriously stopped manufacturing methamphetamine at his home and removed all evidence of his operations there, while continuing to maintain all of his other operations.

Where the location to be searched is a suspected drug dealer's home, often no greater nexus to that specific location is required because experience dictates that drug dealers ordinarily keep their supply, records, and monetary profits at home. *See generally* 2 LaFave, at 379. It literally defies commonsense, where there is good reason to believe that the defendant (while out of jail on bond for doing the same thing) continues to use methamphetamine, to acquire a supply of the materials required for its manufacture, and in fact to manufacture the drug at a number

of locations simultaneously; and where he clearly manufactured the drug in his home before being arrested and was observed still doing so at least four months afterward; to hold that there is not even a reasonable probability that his home has continued to be one of his manufacturing sites, or at least still contains evidence of his ongoing manufacturing operations. The majority's decision to limit the life-span of probable cause to a set number of days following the last information of drug manufacturing at a particular location is not only contrary to our prior holdings but fails to appreciate the significance of being a continuing and ongoing operation.

While I am concerned about the majority's attempt to distinguish this case from our prior "course of conduct" cases on the grounds that we have not previously decided a case involving the same number of days between observation and issuance, *see* maj. op. at 1115, I am much more concerned by its holding that no well-trained police officer could reasonably believe the information to still establish probable cause. The majority not only reduces the probable cause determination to a mechanical (if not arbitrary) counting process; it forces police officers to predict precisely where the court will draw the cutoff line. Even if it did not fly in the face of an abundance of counter-examples from courts across the country, this holding can only serve to encourage officers to rely on their own counting rather than the appropriate assessment of the nature and circumstances of the criminal activity by a neutral magistrate. Having a good faith exception serves little purpose if acting in good faith means nothing more than accurately predicting the ultimate conclusion of the courts.

The exception to the exclusionary sanction does not apply, nor should it, if the magistrate misbehaves or is misled by police misbehavior, or if the affidavit is so lacking in indicia of probable cause—is so "bare bones"—as to render official belief in its existence entirely unreasonable. In this case, the trial court did not apply the good faith exception because it believed that the month-long interval between observations of manufacturing in the defendant's home and

issuance of the warrant not only rendered that information stale but made unreasonable any belief by trained officers that the affidavit contained probable cause for the search. In upholding that ruling, the majority in effect finds it unreasonable for well-trained officers to rely on a probable cause determination by a neutral magistrate that would be upheld as fully justified by other justices of the jurisdiction's highest court.

The good faith exception to the exclusionary rule springs from the realization that the suppression of evidence as a sanction is unlikely to significantly modify executive branch behavior undertaken in objectively reasonable good faith. *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In addition to avoiding an extremely high cost to society, with little corresponding benefit, the exception has an additional salutary effect of promoting a judicial preference for warrants, by largely insulating executive branch officers from the mistakes of judicial magistrates. Not only does the majority's narrow interpretation nullify virtually any beneficial effect of the good faith exception; its unrealistic time and place restrictions on the probable cause determination severely undercut incentives to seek warrants in cases of ongoing methamphetamine operations. If delay by the police, in order to accumulate more and better information, is rewarded by disallowing information as stale, police will be faced with the dilemma whether to act on less information while it is more fresh, relying on the exigencies of the situation to excuse judicial approval in advance. Because I consider the majority holding to be wrong, both as a matter of law and as a matter of policy, and because I believe it will have a substantial negative impact on combating a serious social problem in this jurisdiction, I respectfully dissent.

I am authorized to say that JUSTICE KOURLIS and JUSTICE RICE join in this dissent.

### Appendix A

STATE OF COLORADO

COUNTY OF FREMONT

ss. AFFIDAVIT

In support of a request for the issuance of a SEARCH WARRANT FOR: 406 Riverside Drive, a yellow house with blue trim, located in the City of Canon City, County of Fremont, State of Colorado to search for Methamphetamine, ephedrine based pills, psudoephedrine based pills, drug paraphernalia, Methamphetamine lab equipment, precursor chemicals, money, records, weapons, receipts, and any other items that would relate to the use, possession, manufacturing, or trafficking of drugs.

THE UNDERSIGNED AFFIANT, BEING FIRST DULY SWORN UPON OATH, DEPOSES AND SAYS:

Your Affiant is Andrew J. Lopez, a Police Officer with the Canon City Police Department. I have been employed as a police officer for approximately seven years and am currently assigned to the narcotics investigations division of the Canon City Police Department. I have attended at least 192 hours of narcotics training involving the searches of vehicles and homes containing Methamphetamine labs, money, precursor chemicals, lab equipment, multiple grams of illegal drugs, and large amounts of money. I have also experienced first hand searches of vehicles and homes containing Methamphetamine labs, money, precursor chemicals, lab equipment, multiple grams of illegal drugs, and large amounts of money.

On December 12th, 2002 I received a phone call from South Metro Drug Task Force Agent Angela Fritz, who advised she had information regarding the manufacture of methamphetamine in Canon City. Agent Fritz advised the following:

- She had two persons in custody after they were reported to have been purchasing large quantities of ephedrine and pseudoephedrine based pills at a store in her area
- They stopped the two persons at a traffic stop and saw in plain view numerous boxes of pills and a glass methamphetamine pipe
- One of the two persons, wishing to remain anonymous, told her the following:
 - ▲ On Monday, December 9th, 2002, they were in Wade Miller's house, 406 Riverside Drive, Canon City, Fremont County, Colorado, and Wade was actively manufacturing methamphetamine in the house
 - ▲ They smoked some methamphetamine with Wade, which he had just manufactured
 - ▲ Wade had Toluene, Coffee Pots, Muriatic Acid, Anhydrous Ammonia and Salt
 - ▲ Wade's batch of methamphetamine was "salting out"
 - ▲ Wade drive's [sic] a Blue Ford Bronco
 - ▲ Wade is keeping methamphetamine manufacturing supplies under the kitchen cabinets in his house
 - ▲ They are a methamphetamine user and manufacturer and were collecting pills to manufacture methamphetamine
 - ▲ Wade Miller has also been cooking at an address on Orchard, at the entrance to Mountain View Park, in the last trailer to the East
 - ▲ The trailer belongs to Valerie Shetrone and a man named Nick (last name unknown)
 - ▲ Valerie and Nick allow Wade and Jacob Lopez to manufacture methamphetamine in the trailer
 - ▲ The trailer has an addition to the rear with some sort of aluminum cover over it
 - ▲ Jacob Lopez has been recently arrested, but Wade continues to manufacture in the trailer
 - ▲ Approximately 2 weeks ago they personally observed Sudafed pills, Xylol, a "bubbler," Red Devil Lye, Tubing, and Glassware in this trailer home
 - ▲ Wade has been regularly manufacturing methamphetamine at either the Riverside or the Orchard address

Agent Fritz went on to say the second person arrested, wishing to remain anonymous, offered Jim Sampson's current location, stating that Jim was at the Econo Lodge on the North end of Pueblo, and had a warrant for his arrest.

I advised Canon City Police Department Detective Jeff Worley of the information I received. Detective Worley identified the

Orchard address as 926 Orchard, with a trailer number believed to be # C, and described it as two White trailer houses with Brown trim, connected by some kind of walkway between the two, with a round metal building attached on the North side. Detective Worley found one car parked at the trailer, bearing Colorado license plate number 629CRH, which came back to a Claudia J. Shetrone and a Valeria R. Holtz of 926 Orchard Avenue. Detective Worley also went to 406 Riverside where he found an 85 Ford 2 door, bearing Colorado license plate number NOV-LU, which came back to James E. and Marsha L. Miller. Detective Worley indicated that there were several people around the property at the time he went by.

I recognized all the chemicals and terms referred to by the first anonymous party as being integral parts of the methamphetamine manufacturing process. I know Jacob Lopez was just recently arrested and Wade Miller is currently out on bond on charges of manufacturing and distributing methamphetamine, after I found a meth lab in his home on August 14th, 2002. I also know Jacob Lopez was arrested following the seizure of this meth lab, when he approached 406 Riverside and was found to have methamphetamine and paraphernalia with him. I also know Jim Sampson was wanted on a warrant for manufacturing meth at his shop at 2027 South Street, located [sic] on November 22nd, 2002. I recalled Wade Miller's Criminal History and knew he was arrested in Canon City 1992[sic] for 2 counts of Distributing Marijuana, and Distribution of Dangerous Drugs (Methamphetamine).

On January 3rd, 2002[sic] Fremont County Sheriff's Deputy Mike Joliffe spoke to a person, wishing to remain anonymous, who advised the following:

- ▲ Wade Miller 05/25/64 is driving a navy blue, Ford, Bronco
- ▲ Wade Miller and Jacob Lopez manufacture methamphetamine together
- ▲ Jeff West owns a fake penis that has a fake bladder, that West, Jacob Lopez and Wade Miller use to pass urinalysis test [sic] as part of the M.A.P.P. program
- ▲ Wade Miller uses his boss's credit card to purchase urine from an online business through the internet
- ▲ Wade Miller and Jacob Lopez use a trailer located on Orchard Avenue in Canon City. This trailer is next to Mountain View Park. The trailer has a metal rounded building located at the back of the trailer
- ▲ The trailer they use to manufacture methamphetamine belongs to Nick Bufmack
- ▲ Bufmack stated to Miller, that it is ok to make meth in the trailer, but he wants to know when they are doing it
- ▲ Bufmack has a girlfriend named Val (the only name this person has ever heard her called)
- ▲ Val has a mother that lives in the area of the trailer and has in the past reported smelling strange smells coming from the area
- ▲ Recently the police responded to one complaint of the smell and Jacob Lopez was hiding in the trailer until they left
- ▲ A person by the name of Jim Woldridge purchases the chemicals and ephedrine based pills for Wade Miller
- ▲ Wade Miller manufactures methamphetamine on Friday nights, but only if he has at least 1000 ephedrine based pills to cook with
- ▲ Wade Miller in the past has gone to a home in Florence that belongs to Cindy and Rod Steele
- ▲ Miller and Rod would manufacture methamphetamine in the shed on the property
- ▲ Rod has anhydrous ammonia tanks buried in the back yard
- ▲ Wade Miller's brother Chuck Miller and his girlfriend/wife with a last name of Washburn, will go to Salida and Denver to purchase Ephedrine based pills for Wade
- ▲ Chuck and Washburn live on some property up in Tallahassee
- ▲ Wade will go up on the property on occasion to manufacture methamphetamine

▲ Wade has anhydrous ammonia tanks buried on the property

▲ Wade is sharing anhydrous ammonia tanks with John Messer

▲ Messer lives in Williamsburg.

On this same date Fremont County Sheriff's Deputy Jay Dexter arrested Wade Miller for driving under revocation. Miller was arrested driving a blue, Ford, Bronco that registered to Harmony Britton. I arrested Harmony Britton for possession of Methamphetamine after she approached 406 Riverside following the seizure of the meth lab at the residence on August 14th, 2002.

I recognized all the chemicals and terms referred to by the first anonymous party as being integral parts of the methamphetamine manufacturing process. I know Jacob Lopez was just recently arrested and Wade Miller is currently out on bond on charges of manufacturing and distributing methamphetamine, after I found a meth lab in his home on August 14th, 2002. I have received several anonymous tips since Wade Miller bonded out that he has continued to manufacture and sell methamphetamine. I also arrested Jacob Lopez following the seizure of this meth lab, when Jacob approached 406 Riverside there was methamphetamine and paraphernalia on his person.

Wade Miller's Criminal History shows the following:

1992 arrested for marijuana distribution and distribution of dangerous drugs.

1994 arrested for DUI.

2002 arrested for distribution and manufacturing of schedule II, possession of schedule II, possession of narcotic equipment, driving under the influence of drugs, marijuana and unlawful manufacturing of schedule II.

I know the anonymous person that spoke to Deputy Jolliffe is not the same as the anonymous person I spoke to, because they are of different genders.

Subscribed and sworn before me this 6th Day of January, 2003.